IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, SOUTHERN DIVISION

COURTNEY McBRIDE,              )
                               )
     Plaintiff,                )
                               )        CIVIL ACTION NO.
     v.                        )         1:12cv1047-MHT
                               )             (WO)
HOUSTON COUNTY HEALTH CARE     )
AUTHORITY d/b/a Southeast      )
Alabama Medical Center,        )
et al.,                        )
                               )
     Defendants.               )

### OPINION AND ORDER

Plaintiff Courtney McBride charges that, while she
was in pre-trial custody in a city jail, the following
defendants subjected her to violations of both federal
and state law: Dothan Police Chief Greg Benton; the City
of Dothan, Alabama; Dr. Dinesh Karumanchi; and the
Houston County Health Care Authority.  She claims Police
Chief Benton and the City of Dothan deliberately denied
her needed medical treatment in violation of the
Fourteenth Amendment (as enforced by 42 U.S.C. § 1983)
and state law.  Additionally, she claims that, to the

extent that she was provided limited treatment by Dr. Karumanchi and the Houston County Health Care Authority (which operates the Southeast Alabama Medical Center), it was inadequate and caused her to suffer serious, permanent injuries that are compensable under the Alabama Medical Liability Act (1975 Ala. Code §§ 6-5-480 to -488 and 6-5-540 to -552).  Subject-matter jurisdiction is proper under 28 U.S.C. §§ 1331 (federal question), 1332 (diversity), 1343 (civil rights), and 1367 (supplemental).  The case is now before this court on the defendants' motions to dismiss.  For the reasons that follow, the motions will be granted in part and denied in part.

## I. MOTION-TO-DISMISS STANDARD

In considering a defendant's motion to dismiss, the court accepts the plaintiff's allegations as true, Hishon v. King & Spalding, 467 U.S. 69, 73 (1984), and construes the complaint in the plaintiff's favor, Duke v. Cleland,

5 F.3d 1399, 1402 (11th Cir. 1993). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Scheuer v. Rhodes, 416 U.S. 232, 236 (1974). To survive a motion to dismiss, a complaint need not contain "detailed factual allegations," Bell Atl. Corp. v. Twombly, 550 U.S. 544, 545 (2007), "only enough facts to state a claim to relief that is plausible on its face." Id. at 574.

## II. BACKGROUND

McBride's allegations are as follows: While in pre-trial custody at the Dothan city jail, McBride was referred to the Southeast Alabama Medical Center for a psychiatric evaluation. There, under the care of Dr. Karumanchi, she was treated for a major depressive disorder, psychotic disorder, and bipolar disorder. Dr. Karumanchi prescribed numerous medications, one of which was Lamictal, a seizure medication. The doctor did not

3

warn McBride that it had been documented that Lamictal causes sometimes Stevens-Johnson Syndrome, a severe skin condition that, if not treated, results in serious and permanent disfigurement.

Although Dr. Karumanchi did not warn McBride about the risk of the syndrome, he did warn her that it was important that the medication be administered properly. Fearful that jail officials would be unable or unwilling to administer the medicine properly, McBride and her mother pleaded with the doctor not to discharge her. Nevertheless, after a two-week hospitalization, she was discharged to the jail with instructions that she continue taking her prescribed medications, including Lamictal.  Dr. Karumanchi instructed the officer who was escorting McBride that, if her condition worsened, she should be brought to the hospital's emergency room.  The officer relayed that information to all other jail officials, including Police Chief Benton.

4

Almost immediately after returning to the jail, McBride's physical health worsened.  She complained to officers of a sore throat, difficulty swallowing, and fever.  Her face became swollen.  Over the following days, McBride's condition continued to decline steadily. By the time six days had passed, she was in extreme pain, which she described as "9," on a scale of "1 to 10."  She had earache, congestion, fever, chills, and trouble eating.  She was dehydrated and in a weakened, disoriented state.  Her skin had started to show abnormalities.  These were all symptoms of the early stages of Stevens-Johnson Syndrome.

Throughout that week of declining health, McBride made repeated requests to numerous jail officials for medical attention, but she was ignored.  These requests were relayed to Chief Benton, but he also did nothing. (The complaint is somewhat ambiguous on the precise extent of Benton's knowledge over the course of these days, but it does allege clearly that at least some of

5

her complaints were relayed to him.)  The seriousness of the situation was apparent to other jail detainees who witnessed McBride's declining health.  They pleaded with officers to obtain medical attention for McBride, but no action was taken.  In addition to refusing medical attention, the jailers did not administer McBride's medications properly.  They gave her medicine at improper times and, on several occasions, failed to provide her medicine altogether.

Six days after McBride's pleadings for medical attention began, she was finally permitted to see a doctor at the Southeast Alabama Medical Center emergency room.  The doctor did not realize that she was in the early stages of Stevens-Johnson Syndrome, instead diagnosing her with only pharyngitis-tonsilitis (a virus that causes inflammation of the throat and tonsils), canker sore (a painful mouth sore), and rash.  She was returned to the jail that same day.

Either that same day or the next (the complaint is unclear), McBride was released from the jail's custody. She returned again to the emergency room (of her own volition this time) and voiced similar complaints as she had on the prior visit. Despite exhibiting classic symptoms of Stevens-Johnson Syndrome, the hospital staff again failed to diagnose the condition. Their questions to McBride focused on whether she had engaged in rough sex. They concluded that McBride had, in addition to the conditions diagnosed previously, blisters and candidiasis (a fungal infection) and nothing more.

The next day, McBride made her fourth visit to the emergency room. By that time, a rash covered essentially her entire body; her skin was falling off; and she was in extreme and excruciating pain. For the first time, hospital staff recognized her as suffering from Stevens-Johnson Syndrome as a result of the Lamictal, and her use of the medication was discontinued. She was transferred

to the hospital's intensive-care unit and some time later to the burn unit.

Today, as a result of the syndrome being left untreated for so long, McBride has severe scarring over the majority of her body.  She has lost all of her hair and her nails now grow abnormally.  Her vision has been weakened, and she no longer menstruates.  She is under constant, extreme pain.  She contends that, if she had received earlier and better care, this all could have been prevented.

### III. DISCUSSION

#### A. Deliberate-Indifference Claim Against Police Chief Benton

McBride contends that Police Chief Benton violated her constitutional rights when he, aware of her dire need for medical care, denied her access to a doctor for approximately one week.  Benton responds that, on the facts alleged, the complaint does not make out a plausible claim against him and, alternatively, to the

8

extent that it may, he is nevertheless immune from liability.

## 1. Sufficiency of the pleading

The deliberate indifference of jail officials to the serious medical needs of pre-trial detainees violates the Fourteenth Amendment. <u>Lancaster v. Monroe Cnty.</u>, 116 F.3d 1419, 1425 (11th Cir. 1997). A jailer acts with "deliberate indifference" when he knows that a detainee is in serious need of medical care, but he fails or refuses to obtain medical treatment. <u>Id</u>. (collecting illustrative cases). A detainee's need for medical care is "serious" when, if the need is unmet, it poses a substantial risk of serious harm. <u>Taylor v. Adams</u>, 221 F.3d 1254, 1258 (11th Cir. 2000) (citing <u>Estelle v. Gamble</u>, 429 U.S. 97, 104 (1976), and <u>Farmer v. Brennan</u>, 511 U.S. 825, 834 (1994)). A need is also "serious" when it is "so obvious that even a lay person would easily recognize the necessity for a doctor's attention."

9

Farrow v. West, 320 F.3d 1235, 1243 (11th Cir. 2003)
(quotation marks and citation omitted).   Where medical
care is ultimately provided, a jailer's conduct may
nevertheless be unconstitutional if the treatment was
deliberately delayed, "even for a period of hours."
McElligott v. Foley, 182 F.3d 1248, 1255 (11th Cir.
1999); see also id. at 1257 ("A core principle of Eighth
Amendment jurisprudence in the area of medical care is
that prison officials with knowledge of the need for care
may not, by ... delaying care, ... cause a prisoner to
needlessly suffer the pain resulting from his or her
illness.").

There can be little doubt that McBride's allegations
make out a claim of deliberate indifference.   According
to her complaint, Chief Benton was made aware that Dr.
Karumanchi had instructed that, if McBride's condition
worsened in the jail, she should be brought back to the
emergency room and that, regardless, Benton ignored her
pleas for medical attention when her face became swollen,

10

a fever developed, and she began to have difficulty eating. Over the following days, according to McBride's complaint, her condition worsened further to the point that other detainees (all lay persons, not medical professionals), aware of the obvious need for medical attention, pleaded with jail officials to obtain medical care, and Benton still did nothing.

In response, Chief Benton raises several contentions about the adequacy of McBride's complaint. First, he argues that the complaint's allegation that he was made aware of her requests for medical attention is "cryptic," "conclusory," and "implausible" and should therefore be discounted by this court. Def.'s Br. (Doc. No. 18) at 12. The court, however, sees nothing cryptic, conclusory, or implausible about a supervisory official at a jail being informed of a detainee's requests for medical care.

Second, Chief Benton argues that McBride's complaint commits a "sleight of hand" by portraying, deceptively, the nature of Dr. Karumanchi's instructions about

11

returning McBride to the emergency room if her conditions
worsened.   According to Benton, the "conditions" the
doctor mentioned were exclusively psychological (not
physical) conditions; therefore, once McBride's physical
conditions deteriorated, the jailers had no reason to
think medical care was needed.   Id. at 12-13.   McBride
contests Benton's interpretation of the doctor's
statement, instead alleging that Dr. Karumanchi asked for
McBride's return if her "general health" worsened "in
light of the ongoing prescription of Lamictal," a
medicine known to create the risk of Stevens-Johnson
Syndrome.   Pl.'s Br. (Doc. No. 23) at 4.   She offers to
amend her complaint to eliminate any possibility of
ambiguity, but no amendment is necessary.   If there was
previously any risk of misunderstanding McBride's
allegations, that risk has now been eliminated: The
complaint alleges that Benton had knowledge of the
doctor's instructions to return McBride to the emergency
room if her general health worsened and that Benton
deliberately ignored those instructions.

Third, Chief Benton contends that, even if he did ignore for almost a week McBride's writhing in pain and begging to see a doctor, he should not be held responsible for that delay, because, even if he would have permitted the ailing detainee to go to the emergency room at an earlier time, it is likely that the doctors there would have failed to diagnose properly and treat her Stevens-Johnson Syndrome. Def.'s Br. (Doc. No. 18) at 14. He argues, given that the hospital's doctors eventually did misdiagnose the condition, there is no reason to think they would have done better if afforded an earlier opportunity. Id.[1] The argument is meritless.

_____

1. The police chief's brief makes this argument as follows:

> "The complaint does not contain any factual allegations which plausibly demonstrate that taking the plaintiff to the hospital any earlier would have changed her outcome.... [T]he complaint alleges that doctors at Southeast Alabama Medical Center did not diagnose or treat the plaintiff's alleged condition on two separate hospital visits that occurred <u>after</u> she contends
>
> (continued...)

13

The police chief's obligation to provide medical care to detainees in his custody is not absolved by an assumption that local doctors will provide negligent and inadequate

---

1(...continued)
> Chief Benton should have taken her to the hospital.  The period in question is between the plaintiff's discharge from the hospital on July 4, 2012 and the plaintiff's return to the hospital on July 10, 2012.  The complaint does not plausibly demonstrate that taking the plaintiff back to the hospital on July 5, 6, 7, 8 or 9 would have yielded a different result than occurred when the plaintiff visited the hospital on July 10 and 11.  On each occasion, the plaintiff was evaluated by a different doctor.  On both occasions, the plaintiff was discharged without diagnosis or treatment of Stevens-Johnson Syndrome. The complaint does not plausibly demonstrate how taking the plaintiff to the hospital before July 10--during a period when her symptoms were admittedly less severe-- would have resulted in an earlier diagnosis and treatment.  Based on the foregoing, Chief Benton moves to dismiss [the charge] for failure to state a claim upon which relief can be granted."

(Doc. No. 18) at 14-15 (emphasis in original).

14

care (even if ex-post circumstances to some extent lend credence to the assumption).

Chief Benton's assumption that no good would have likely come from sending her to the hospital earlier is debatable.   McBride contends that, if she had been returned to the hospital the same day she began taking Lamictal and suffering side effects, the doctors there would have been more--not less--likely to identify the real cause of her ailments.   As such, her complaint charges that Chief Benton, in addition to the doctors, at least in part, caused her injury.   It must be remembered that a motion to dismiss is before the court, not a motion for summary judgment; here, if McBride's complaint alleges a plausible claim, the court must allow it to proceed.   There is no serious question that the complaint plausibly alleges that Benton contributed to her injury, and whether that allegation has plausible merit should be resolved on summary judgment or at trial after the evidence is developed, not on a dismissal motion. The police chief is on notice of the charges against him, and

15

he may now defend against them on the basis of actual
evidence, not naked speculation.[2]


### 2. Qualified immunity

Next, Chief Benton argues that, even if McBride does
allege a viable claim against him, he is immune under the

_____

2. Additionally, McBride's claim raises the issue of
whether Benton should be held liable for denying McBride
access to medical care regardless of whether his delay
caused her Stevens-Johnson Syndrome to progress to the
point alleged.  The Sixth Circuit Court of Appeals has
explained: "Where the seriousness of a prisoner's needs
for medical care is obvious even to a lay person, the
constitutional violation may arise.  This violation is
not premised upon the 'detrimental effect' of the delay,
but rather that the delay alone in providing medical care
creates a substantial risk of serious harm.  When prison
officials are aware of a prisoner's obvious and serious
need for medical treatment and delay medical treatment of
that condition for non-medical reasons, their conduct in
causing the delay creates the constitutional infirmity.
In such cases, the effect of the delay goes to the extent
of the injury, not the existence of a serious medical
condition."  Blackmore v. Kalamazoo Cnty., 390 F.3d 890,
899 (6th Cir. 2004); see also Smith v. Carpenter, 316
F.3d 178, 188 (2d Cir. 2003) (holding that "an Eighth
Amendment claim may be based on a defendant's conduct in
exposing an inmate to an unreasonable risk of future harm
and that actual physical injury is not necessary in order
to demonstrate an Eighth Amendment violation").

qualified-immunity doctrine. Qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). Qualified immunity, which was once called "good-faith immunity," see, e.g., Gomez v. Toledo, 446 U.S. 635, 639-40 (1980) ("[A] public official['s] position might entitle him to immunity if he acted in good faith."); Harlow, 457 U.S. at 807 (referring to "qualified or good-faith immunity"), essentially seeks to protect government officials from monetary liability for unexpected changes in the law. As such, if a government official is alleged to have violated legal rights that were not "clearly established" in the law at the time of his challenged conduct, this court will not make him pay for the lack of foresight. See Ashcroft v. al-Kidd, 131 S.Ct. 2074, 2085 (2011) ("Qualified immunity gives government officials breathing

17

room to make reasonable but mistaken judgments about open legal questions.").

In deciding whether a legal right was "clearly established" in the law, the question before the court is whether "the state of the law ... gave [the defendant] fair warning that [his] alleged treatment of [the plaintiff] was unconstitutional." Hope v. Pelzer, 536 U.S. 730, 740 (2002). Put another way, "'[c]learly established' for purposes of qualified immunity means that the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." Wilson v. Layne, 526 U.S. 603, 614-15 (1999) (punctuation marks and citations omitted); see also Hope, 536 U.S. at 741 ("[O]fficials can still be on notice that their conduct

18

violates established law even in novel factual
circumstances.").[3]

In 1976, the Supreme Court held that "deliberate
indifference to [the] serious medical needs of prisoners"
violates the Constitution. Estelle v. Gamble, 429 U.S.
97, 104 (1976). Since then, there have been decades of
countless judicial decisions elaborating upon the
government's obligation to provide for the medical care
of those in its prisons and jails. By 2012 (the year of
Benton's alleged conduct), the constitutional rule had
long been "well settled." Harris v. Coweta Cnty., 21

_____

3. Chief Benton disputes this legal standard,
arguing that he is entitled to immunity unless McBride
identifies for the court a case with "indistinguishable
facts." Def.'s Reply Br. (Doc. No. 28) at 6. That is
not the correct standard. See Hope, 536 U.S. at 739
(reversing Eleventh Circuit decision that required case
law with "materially similar" facts); McElligott, 182
F.3d at 1260 ("[O]ne simply cannot say that a prisoner
has a clearly established right to adequate psychiatric
care but that that right is not violated by a particular
treatment amounting to grossly inadequate care unless
some prior court has expressly so held on 'materially
similar' facts. Such an approach would add an
unwarranted degree of rigidity to the law of qualified
immunity.") (quotation marks and citation omitted).

F.3d 388, 393 (11th Cir. 1994); see id. at 393-94
(collecting cases on the evolution of prisoner-medical-
needs jurisprudence).  The court sees nothing about the
allegations in this case that distinguishes it from the
countless judicial decisions elucidating the "core
principle" that jailers, "with knowledge of the need for
care may not, by ... delaying care, ... cause a prisoner
to needlessly suffer the pain resulting from his or her
illness."  McElligott, 182 F.3d at 1257.  Simply put,
Chief Benton is alleged to have, in knowing contravention
of a doctor's instructions to the contrary, denied
medical care to a detainee with an obvious ailment
getting worse by the day.  If the allegation is true, it
is an obvious constitutional violation.  Cf. Hope, 536
U.S. at 738.[4]

_____

        4.  Chief Benton, quoting language from a prior
Eleventh Circuit opinion, argues that:  "[C]ases
involving a delay in medical treatment" are "highly fact-
specific and involve an array of circumstances pertinent
to just what kind of notice is imputed to a government
official and to the constitutional adequacy of what was
done to help and when.  Most cases in which deliberate
                                        (continued...)

Chief Benton, giving the complaint an unjustifiably cramped reading, understands it to allege that, until the day in which he permitted McBride to return to the hospital (about a week after she initially requested it), she had exhibited nothing more than minor "cold-like symptoms, which are not a serious medical condition" triggering a governmental obligation to respond. Def.'s Reply Br. (Doc. No. 28) at 16. He argues, given those symptoms, existing case law did not put him on notice of a constitutional obligation to respond. As an initial matter, the court is troubled by the police chief's characterization of McBride's symptoms as merely "cold-like." The court does not read the complaint the same

_____

4(...continued)
indifference is asserted are far from obvious violations of the Constitution." Bozeman v. Orum, 422 F.3d 1265, 1274 (11th Cir. 2005). Regardless of the accuracy of that broad description, in dicta, of "most cases," the allegations against Benton in this case do, in fact, amount to an obvious violation. See id. at 1274 (denying qualified immunity because prison officials "knew [the prisoner] was unconscious and not breathing and--for fourteen minutes--did nothing").

21

way.[5]  Additionally, Benton's contention invokes a "highly

--------------------

5.   The complaint describes McBride's conditions leading up to her eventual readmission to the hospital as follows:

> "Almost immediately [after returning to the jail from her initial stay in the hospital] her condition worsened.  She began to complain to jailers of a sore throat, difficulty swallowing and fever. Her face was swollen....  Over the next several days, Ms. McBride's condition continued to decline....  Ms. McBride and other detainees who observed her steadily declining condition pleaded with jailers to obtain immediate attention for Ms. McBride....  Finally, on July 10, 2012, Ms. McBride was transported to SAMC Emergency Room.  At that time she complained of sore throat, difficulty swallowing, trouble eating, earache, congestion, swollen face, fever and chills.  She was dehydrated.  She was in a weakened, confused and disoriented state.  She was in extreme pain, rating her pain as a nine out of ten."

Compl. (Doc. No. 1) ¶¶ 14-17.  Benton's reading of the complaint as alleging nothing more than "cold-like symptoms" up until July 10, when "more serious symptoms [first] emerged" (and Benton was immediately thereafter taken to the hospital), Def.'s Reply Br. (Doc. No. 28) at 4, does not square with the complaint's plain description of her gradually declining condition.  See Fed. R. Civ. P. 8(e) ("Pleadings must be construed so as to do
(continued...)

fact-specific [issue] and involve[s] an array of circumstances pertinent to just what kind of notice is imputed to [him] and to the constitutional adequacy of what was done to help and when." Bozeman v. Orum, 422 F.3d 1265, 1274 (11th Cir. 2005).  As such, it is inappropriate for resolution at the motion-to-dismiss stage.  See Bannum, Inc. v. City of Fort Lauderdale, 901 F.2d 989, 999 (11th Cir. 1990) (district court, before discovery, "terminated [the case] at a premature stage" on the basis of immunity); cf. Todd v. Exxon Corp., 275 F.3d 191, 199 (2d Cir. 2001) ("[C]ourts hestitate to grant motions to dismiss for failure to plead [issues requiring] deeply fact-intensive inquir[ies].").  As this court reads the complaint to allege adequately a constitutional violation, the court will not dismiss the case based on speculation about what the evidence may eventually show.

---

    5(...continued)
justice.").

### 3. Individual versus official capacity suits

Finally, there is the issue that Police Chief Benton, in addition to being sued in his "individual capacity," has also been sued in his "official capacity" as a city agent, while McBride has also named the city itself as a defendant. A lawsuit against a municipal officer in his official capacity is functionally equivalent to suing the municipality itself, and, therefore, naming both as defendants is redundant and unnecessary. See Busby v. City of Orlando, 931 F.2d 764, 776 (11th Cir. 1991) (affirming district court's dismissal of § 1983 claims against official-capacity defendants, stating, "To keep both the City and the officers sued in their official capacity as defendants in this case would have been redundant and possibly confusing to the jury."). Therefore, the court will dismiss the lawsuit against Benton in his official capacity (but not his individual capacity) to eliminate the redundancy. In all other respects, the deliberate-indifference claim against Benton will proceed.

24

## B. Deliberate-Indifference Claim Against Police Chief Benton Based on Supervisor Liability and Deliberate-Indifference Claim Against the City of Dothan Based on Municipal Liability

In addition to claiming that Chief Benton personally caused her suffering by delaying medical care, McBride further charges that Chief Benton, in his supervisory capacity, and the city itself established an austere policy and custom regarding the provision of medical care at the jail such that, when she needed medical attention, all staff at the jail, in addition to Benton himself, refused affording it to her.

### 1. Police Chief Benton

Chief Benton may be personally liable for his supervisory conduct in four ways. McBride may show (1) that Benton "personally participate[d] in the unconstitutional conduct" of others at the jail. Harper v. Lawrence Cnty., 592 F.3d 1227, 1236 (11th Cir. 2010). Or she may show that "there [was] a casual connection between the [unconstitutional] conduct and [Benton's]

actions, and [t]here are three ways to establish such a causal connection:" (2) "when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so"; (3) "when a supervisor's custom or policy results in deliberate indifference to constitutional rights"; or (4) "when facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so."   <u>Id</u>. at 1236 (citation and punctuation omitted).

Because Chief Benton is alleged to have personally participated in his and his staff's deprivation of McBride's constitutional rights--that is, that he, like the staff under him, personally knew of her dire need for medical care and he nevertheless refused to provide it-- that is enough to make out adequately a deliberate-indifference claim based on supervisor liability.  For the reasons already discussed, Chief Benton is not

26

entitled to qualified immunity against that claim.[6]  Cf.

id. at 1237 ("In our view, our prior pronouncements on

the illegality of delayed or inadequate treatment for

alcohol withdrawal should have sufficed to put the

supervisor[s] on notice ... that delayed or inadequate

treatment of alcohol withdrawal would be unlawful.  Those

cases should also have put supervisors on notice that

policies or customs of delayed investigation into and

─────────────────

        6.    Because  Chief  Benton  is  alleged  to  have
personally participated in the unconstitutional conduct,
the court's analysis may stop there and need not address
the issue of Benton's possible liability if a policy or
custom  he  established  resulted  in  other  jail  staff
causing a constitutional violation with which the police
chief did not personally participate.   If the facts
ultimately show as much, the qualified-immunity inquiry
becomes more complicated because the question may become,
for example, whether Benton had sufficient notice of his
subordinate's  wrongdoing  to  require  him  to  modify
existing policies or implement new policies altogether.
Such questions, which are unnecessary to address now
stage, will be evaluated on the basis of the evidence
presented.  Cf. Camilo-Robles v. Zapata, 175 F.3d 41, 46
(1st Cir. 1999) ("[T]he extent of a superior's knowledge
of his subordinate's proclivities is a central datum in
determining whether the former ought to be liable (or
immune from suit) for the latter's unconstitutional
acts.... [H]owever, the question of notice is hopelessly
factbound.") (citation omitted).

treatment of alcohol withdrawal would be unlawful as well.").

## 2. City of Dothan

Similarly, to hold the city liable, McBride must show that the city itself, acting through an agent with final authority, whether Chief Benton or another, was responsible for an official policy of deliberate indifference to the medical needs of jail detainees or a custom of permitting such indifference, and that the policy or custom was the driving force behind the violation to McBride's rights. See, e.g., McDowell v. Brown, 392 F.3d 1283, 1289 (11th Cir. 2004) (discussing Monell v. Dep't of Soc. Serv., 436 U.S. 658 (1978), and its progeny). If liability rests on a custom (rather than an official policy) it is generally necessary to show a practice that is so "persistent and wide-spread" that it "takes on the force of law." Id. at 1290 (quotation marks and citations omitted).

28

McBride alleges that, regardless of whether Chief Benton himself knew of her individual need for care, she was denied care because of a broader policy or custom of inadequately providing medical care to detainees, a policy so restrictive that detainees in addition to McBride were regularly denied needed access to doctors. She claims that the defendants inadequately trained jail staff to address medical needs and inadequately funded and staffed the jail.  The city argues that McBride's allegations are too vague and scarce on detail to amount to a plausible claim, and should thus be dismissed.  The court disagrees.  Given that McBride has alleged, in detail, a pattern of numerous jail officials, including Benton himself, ignoring her obvious need for medical attention for an extended period, it is not implausible that the multiple jailers were acting pursuant to a common policy or custom, whatever the precise contours that policy or custom may have.  See Powe v. City of Chicago, 664 F.2d 639, 650 (7th Cir. 1981) ("[W]here the plaintiff alleges a pattern or a series of incidents of

unconstitutional conduct, then the courts have found an allegation of policy sufficient to withstand a dismissal motion.").

McBride's allegations of a policy or custom are sufficiently descriptive for the city to defend against. Moreover, she could not reasonably be expected to assert more, given that discovery has not yet occurred. <u>See Smith v. Brevard Cnty.</u>, 461 F. Supp. 2d 1243, 1250 (M.D. Fla. 2006) (Presnell, J.) ("Plaintiff will have the opportunity during discovery to learn the specifics of the practices and customs that go on inside BCDC, however these specifics need not be alleged in the Complaint. To require such specificity would mean that Plaintiffs would be required to know the inter-workings of correctional facilities before they could bring a complaint. As correctional facilities are generally closed off from the public eye, this would be a difficult task at best.").

In short, McBride has alleged enough to make out adequately a claim against the city.

## C. State-Law Claims Against Police Chief Benton
## and the City of Dothan

McBride asserts state-law claims of negligence and wantonness against Chief Benton and the city. Both defendants, in response, contend that they are immune under state law. McBride concedes that the negligence and wantonness claims against Benton should be dismissed, and therefore, the court will dismiss them pursuant to the parties' agreement. However, McBride contests the city's purported immunity.

The wantonness claim against the city can easily be dismissed, as, under Alabama law, "a city cannot be liable for wanton conduct." Hollis v. City of Brighton, 885 So. 2d 135, 142 (Ala. 2004). That leaves the negligence claim. The parties agree that state-law immunity does not shield the negligent conduct of a jail officer. See Walker v. City of Huntsville, 62 So. 3d 474, 501 (Ala. 2010) ("We now hold that a municipal jailer who lacks the authority of a police officer cannot claim immunity under concepts applicable to the immunity

of a State agent."). Moreover, the parties agree that the city may be held vicariously liable for the negligent conduct of its employees, acting in the scope of their employment, who are not themselves immune, including jailers. See City of Lanett v. Tomlinson, 659 So. 2d 68, 70 (Ala. 1995) (under 1975 Ala. Code § 11-47-190, a "municipality may be liable ... under the doctrine of respondeat superior for injuries that result from the wrongful conduct of its agents or officers in the line of duty"). Therefore, it seems obvious that McBride has alleged a viable claim for negligence against the city.

The city's argument to the contrary relies on a strained reading of McBride's complaint. Construing the complaint's language strictly, the city argues that it pleads only that the city itself "breached a duty to the plaintiff," rather than pleading that jailers for whom the city is vicariously liable breached a duty. Def.'s Reply Br. (Doc. No. 28) at 18. The court sees little purpose in dismissing the complaint over this minor ambiguity, and, thus, the court declines to do so. See

32

Fed. R. Civ. P. 8(d) and (e); <u>see also</u> 5 Wright & Miller,

<u>Federal Practice and Procedure</u> § 1286 (3d ed. 2004) ("One

of the most important objectives of the federal rules is

that lawsuits should be determined on their merits and

according to the dictates of justice, rather than in

terms of whether or not the averments in the paper

pleadings have been artfully or inartfully drawn.").

In sum, McBride's state-law claims against Chief

Benton and the wantonness claim against the city will be

dismissed.  The negligence claim against the city will go

forward, as the city may be held vicariously liable for

the negligent conduct of its jailers.


### D. Punitive-Damages Claims Against the City of Dothan

In addition to other requested relief, McBride

charges that the city should be made to pay punitive

damages.  However, the city is immune from McBride's

claims for punitive damages under both federal and state

law.  See <u>City of Newport v. Fact Concerts, Inc.</u>, 453

U.S. 247, 271 (1981) (federal); <u>Carson v. City of</u> <u>Prichard</u>, 709 So. 2d 1199, 1205 (Ala. 1998) (state). Therefore, McBride's claims against the city will be dismissed insofar as they seek punitive damages, but not insofar as they seek other relief.


### E. Medical-Malpractice Claims Against Dr. Karumanchi and the County Health Care Authority

With a terse, single-sentence request, Dr. Karumanchi asks this court to dismiss McBride's medical-malpractice claim against him because it fails to state a claim upon which relief can be granted.  In the absence of legal argument of any sort, this court declines the invitation to speculate on the grounds, if any, that Dr. Karumanchi has in mind.  <u>See</u> Fed. R. Civ. P. 7(b)(1)(B) ("A request for a court order must be made by motion [which] state[s] <u>with particularity</u> the grounds for seeking the order.") (emphasis added).  In the alternative, the doctor asks that the court sever the claims against him for separate proceedings.  Again, he offers no explanation as to why

that course is proper, <u>see</u> Fed. R. Civ. P. 42(b)
(providing grounds for separate trials), and this court
will not guess.

With equally sparse briefing, both Dr. Karumanchi and
the Houston County Health Care Authority contend that the
state-law claims against them predominate substantially
over the federal-law claims, and, therefore, this court
should decline to exercise supplemental jurisdiction over
them.  <u>See</u> 28 U.S.C. § 1367(c)(2) ("The court may decline
to exercise supplemental jurisdiction over a [state-law]
claim if ... the claim substantially predominates over
the ... claims over which the district court has original
jurisdiction.").  The court disagrees that the state-law
claims predominate here.  Moreover, even if that were the
case, they would still fall properly within the court's
diversity jurisdiction under 28 U.S.C. § 1332.

Dr. Karumanchi's and the Houston County Health Care
Authority's dismissal motions will be denied.

35

**\* \* \***

Accordingly, it is ORDERED that defendants Greg Benton and City of Dothan's motion to dismiss, etc. (Doc. No. 17) is granted in part and denied in part as follows:

(1) Defendant Benton is dismissed insofar as he is sued in his official capacity.  He remains a defendant in his individual capacity.

(2) Plaintiff Courtney McBride's request for punitive damages against defendant City of Dothan is denied.

(3) Plaintiff McBride's following claims are not dismissed and will proceed in this case: (a) the federal deliberate-indifference claim against defendant Benton in his individual capacity; (b) the federal deliberate-indifference claim, based on supervisor-liability, against defendant Benton in his individual capacity; (c) the federal deliberate-indifference claim, based on municipal-liability, against defendant City of Dothan; and (d) the state-law negligence claim against the defendant City of Dothan.

36

(3) Plaintiff McBride's following claims are dismissed and will not proceed in the case: (a) the state-law negligence and wantonness claims against defendant Benton and (b) the state-law wantonness claim against the defendant City of Dothan.

It is further ORDERED that defendants Dinesh Karumanchi's and Houston County Health Care Authority's motions to dismiss, etc. (Doc. Nos. 10 & 26) are denied and plaintiff McBride's medical-malpractice claims against them are not dismissed and will proceed in this case.

DONE, this the 7th day of June, 2013.

    /s/ Myron H. Thompson
UNITED STATES DISTRICT JUDGE