UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| COURTNEY MCBRIDE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:12cv1047-MHT-TFM |
| | ) | [wo] |
| HOUSTON COUNTY HEALTH CARE | ) | |
| AUTHORITY d/b/a Southeast | ) | |
| Alabama Medical Center, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court are Defendants' *Motion to Strike* (Doc. 109, filed May 27, 2014), *Motion to Strike* (Doc. 110, filed May 27, 2014), *Motion to Strike the Testimony and/or Opinion of Plaintiff's Expert Carol E. Dankin* (Doc. 133, filed July 3, 2014), *Motion to Strike and Exclude Testimony of Carol Dakin PhD, RN* (Doc. 134, filed July 3, 2014), *Motion in Limine to Exclude or Limit Testimony From Plaintiff's Experts* (Doc. 136, filed July 3, 2014), *Motion to Strike and Preclude Expert Testimony of Dr. Carla Rodgers, Dr. Allan Nineberg, and Dr. Robert Auerbach* (Doc. 138, filed July 3, 2014), and *Supplemental Motion in Limine to Exclude or Limit Testimony From Plaintiff's Experts* (Doc. 151, filed July 17, 2014).   The Court has found two underlying issues within all seven motions, the basic premise being whether Plaintiff's experts are qualified to testify, and whether the Plaintiff's experts' reports are compliant with Rule 26(a)(2)(B).

### I.    DISCUSSION

### A.    Similarly Situated Health Care Provider

Rule 601 of the Federal Rules of Evidence states that "in civil actions and proceedings, with respect to an element of a claim or a defense as to which State law supplies the rule of decision, the competency a witness shall be determined in accordance with State law."   FED. R. CIV. P. 601.   Generally speaking, "state law governs the competency of a witness where the proof is directed at a substantive issue governed by state law."   *Barton v. Am. Red Cross*, 829 F. Supp. 1290, 1299 (M.D. Ala. 1993) *aff'd*, 43 F.3d 678 (11th Cir. 1994) and *aff'd*, 43 F.3d 679 (11th Cir. 1994) (citing Charles A. Wright and Victor J. Gold, 27 Federal Practice and Procedure § 6007 at 78–79 (1990); James Wm. Moore and Helen I. Bendix, 10 Moore's Federal Practice § 601.06 at VI–22 (2d ed. 1993)). Although the basis of jurisdiction in this Court falls under an action for deprivation of civil rights pursuant to 42 U.S.C. § 1983, Rule 601 provides the basis for the source of applicable substantive law.   *Id.*   Since Alabama law provides the rule of substantive law for the issues before this Court, specifically, whether the relevant Defendants committed medical malpractice under the Alabama Medical Liability Act of 1987, § 6-5-542 *et seq.* of the Code of Alabama (1975) ("AMLA"), Alabama law also governs the competency of witnesses to testify as experts on those issues.   *Id.*

The AMLA provides the rule of law governing expert witnesses.   Subsection (e) to § 6–5–548 states that "[a] health care provider may testify as an expert witness in any action for injury or damages against another health care provider based on a breach of the standard of care only if he or she is a 'similarly situated health care provider.'"   ALA. CODE § 6-5-548(e).   The case at bar concerns medical professionals who do not hold themselves out as specialists, thus, subsection (b) to § 6–5–548 provides the proper

analysis.   Subsection (b) states in full:

> Notwithstanding any provision of the Alabama Rules of Evidence to the contrary, if the health care provider whose breach of the standard of care is claimed to have created the cause of action is not certified by an appropriate American board as being a specialist, is not trained and experienced in a medical specialty, or does not hold himself or herself out as a specialist, a "similarly situated health care provider" is one who meets all of the following qualifications:
>
> (1) Is licensed by the appropriate regulatory board or agency of this or some other state.
>
> (2) Is trained and experienced in the same discipline or school of practice.
>
> (3) Has practiced in the same discipline or school of practice during the year preceding the date that the alleged breach of the standard of care occurred.

ALA. CODE § 6-5-548(b).

Plaintiff Courtney McBride ("McBride" or "Plaintiff") offers three expert witnesses to testify about alleged breaches of the standard of care committed by the defendants, and one expert witness to testify about causation.   McBride disclosed Carol E. Dakin, PhD, RN ("Dr. Dakin") to provide expert testimony on the alleged breach of the standard of care committed by Herminia Coppage, RN ("Nurse Coppage").   *See* Doc. 156-1 at 44-53. McBride disclosed Carla Rodgers, M.D. ("Dr. Rodgers), and Allan S. Nineberg, M.D. ("Dr. Nineberg") to provide expert testimony on the alleged breach of the standard of care by Defendants Dinesh Karumanchi, M.D. ("Dr. Karumanchi"), and Rajendra Paladugu, M.D. ("Dr. Paladugu").   *See* Doc. 156-1 at 2-7, 18-19.   McBride disclosed Robert Auerbach, M.D., F.A.A.D., F.A.C.P. ("Dr. Auerbach") to provide expert testimony on causation.   *See* Doc. 156-1 at 29-30.

     *i.*     *Dr. Dakin*

First, the Court will address whether Dr. Dakin is qualified to provide expert testimony on whether Nurse Coppage breached the standard of care.   The record indicates that Dr. Dakin is a licensed Registered Nurse ("RN") in Pennsylvania and New Jersey. *See* Docs. 156-1 at 54; 163-1 at 1.   Thus, she meets the first criterion under subsection (b). *See* ALA. CODE § 6-5-548(b)(1).

Next, the ALMA requires Dr. Dakin to have training and experience in the same discipline or school of practice.   ALA. CODE § 6-5-548(b)(2).   The Alabama Supreme Court explained that subsection (b)(2) requires that a nonspecialist be trained in the practice in which the alleged breach occurred.   *Ex parte Waddail*, 827 So. 2d 789, 795 (Ala. 2001) (citing *Husby v. South Alabama Nursing Home, Inc.,* 712 So.2d 750, 753 (Ala.1998)).   Thus, in order to testify about the breach of the standard of care in this case, Dr. Dakin must possess training and experience in psychiatric nursing.   Dr. Dakin's affidavit and curriculum vitae, which are part of the record, indicate that she received a Bachelor of Science degree ("B.S.N.") in 1966 and a Master of Science degree ("M.S.N.") in 1968 from the University of Pennsylvania School of Nursing, and a Doctorate in Health Professions Education ("Ph.D.") in 1987 from the University of Pennsylvania.   *See* Docs. 156-1 at 54; 163-1 at 1.   The record also indicates that Dr. Dakin has over 45 years of experience as an instructor in psychiatric/mental health nursing which has required her to provide hands-on treatment to patients.   *See* Docs. 156-1 at 55; 163-1 at 1.   Thus, the Court finds that Dr. Dakin has the requisite "training and experience" in psychiatric

nursing to meet the second criterion under subsection (b).   *See* ALA. CODE § 6-5-548(b)(2).

Finally, the third criterion requires that Dr. Dakin has "practiced in the same discipline or school of practice during the year proceeding the date that the alleged breach of the standard of care occurred."   ALA. CODE § 6-5-548(b)(3).   It is undisputed that Dr. Dakin is an adjunct nursing instructor and psychiatric clinical supervisor to nursing students at Temple University's College of Allied Health Sciences where she is "responsible for supervising nursing students in the care of in-patient psychiatric patients." *See* Docs. 134 at 3; 156-1 at 55; 163-1 at 1.   At contention is whether Dr. Dakin "practiced in the same discipline or school of practice."   Defendants contend that as an adjunct instructor, Dr. Dakin has not served as a full-time staff nurse at an in-patient facility since 1972.   *See* Doc. 134 at 3.

In *Dowdy v. Lewis*, the Alabama Supreme Court already decided this very issue. 612 So. 2d 1149, 1152 (Ala. 1992).   The court addressed the issue after the plaintiff alleged that the lower court "erred in permitting testimony of two experts [. . .] who were not qualified" under § 6-5-548(b)(3).   *Id.* at 1150.   The relevant defendant was a medical surgical nurse, and the defendant called two experts on her behalf; one was the associate dean and director of graduate studies at the University of South Alabama, and the other was an instructor and supervisor of nursing students at University of North Alabama School of Nursing.   *Id.* at 1152.   The court explained that "[a]lthough § 6–5–548 does not explain what is meant by 'practice of nursing,' Ala.Code 1975, § 34–21–1(3)(a), defines 'practice of professional nursing,' in part, as follows:

> The *performance,* for compensation, of any act *in the care* and counselling *of persons or in the promotion and maintenance of health and prevention of illness and injury based upon the nursing process which includes* systematic data gathering, *assessment, appropriate nursing judgment and evaluation of human responses to actual or potential health problems through such services as* case finding, *health teaching,* health counselling, and provision of care supportive to or restorative of life and well-being, and executing medical regimens including administering medications and treatments prescribed by a licensed or otherwise legally authorized physician or dentist."

*Id.* at 1151 (quoting ALA.CODE § 34–21–1(3)(a) (1975)) (emphasis in original).   The Court conducted review of both expert witnesses' education and experience, and found that with decades of experience in the same type of nursing as the defendant and the fact that they were "still working in the nursing field as a teacher and supervisor of nursing students as they actually perform nursing care on patients.   The trial court did not abuse its discretion in permitting these registered nurses to testify"   *Id.* at 1152.

As previously stated, Dr. Dakin possesses a Bachelor's degree and Master's degrees in Nursing, and a Ph.D. in Health Professions Education.   Dr. Dakin has been a clinical professor in psychiatric/mental health nursing at seven different universities/colleges spanning over four decades, has attended several continuing education units in the field, and is a teacher and supervisor of psychiatric nursing students as both she and her students perform hands-on nursing care to patients in the behavioral medicine unit.   Dr. Dakin is clearly a "similarly situated health care provider" under 6-5-548(b)(3) and in line with Alabama Supreme Court's decision in *Dowdy.*

However, Defendants attempt to distinguish the ruling in *Dowdy* by arguing that "the court reasoned that these experts 'had devoted their full efforts to the teaching of

nursing' and 'made it their business to determine what was on the 'cutting edge' of the profession by continual study of modern trends in nursing.'"   *See* Doc. 134 at 4 (quoting *Dowdy*, 612 So.2d at 1151).   Thus, the Defendants argue, an adjunct professor is "not devoting her 'full efforts' to the teaching of psychiatric nursing in the year preceding June 25, 2012."   *Id.*   However, the Defendants' argument fails because the Alabama Supreme Court made no such "reason[ing]" in *Dowdy*.   On the contrary, the Court was simply presenting the defendant's argument, and it was not the Court's holding or reasoning.[1] The court did, however, indicate that it agreed with that argument by simply saying "We agree."   *Dowdy*, 612 So.2d at 1151.   However, a simple "[w]e agree" is not a sufficient basis to interpret that the Court intended any sort of full-time versus part-time distinction. In fact, the Alabama Supreme Court has explicitly stated that despite the expert witness at issue being a part-time clinical professor "that fact would not disqualify him as an expert witness, because the statute does not specify the amount of time spent practicing or the nature and quality of the practice."   *Medlin v. Crosby*, 583 So. 2d 1290, 1296 (Ala. 1991).

Here, Dr. Dakin provided an affidavit outlining her training and experience, clarified that at all times she has provided hands-on treatment to patients in her role of

---

[1] The paragraph in full provides:

> Lewis maintains that although in the year preceding the date that the alleged breach of the standard of care occurred, her proffered experts had not performed acts related to the care of persons hospitalized, they had devoted their full efforts to the teaching of nursing, which, she contends, establishes their competence to testify because "each nurse witness ... was a highly qualified expert possessing post-graduate degrees in nursing"; that "these witnesses made it their business to determine what was on the 'cutting edge' of the profession by continual study of the modern trends in nursing"; and "[if] anything, the two witnesses ... were more highly qualified and current in their perception of the existing standard of care than would be required by § 6–5–548(b)." We agree.

*Dowdy*, 612 So.2d at 1151

supervising students in the behavior medicine unit, stating that as an educator she makes it her business to "determine what is on the cutting edge of the profession of psychiatric nursing by [her] continued study of modern trends in nursing." *See* Doc. 163-1 at 1. Thus, the Court finds that she meets the third criterion under subsection (b). *See* ALA. CODE § 6-5-548(b)(3). Since Dr. Dakin meets the requirements of a "similarly situated health care provider," as defined in § 6–5–548(b), she can testify in this case as an expert witness about the alleged breach of the standard of care committed by Nurse Coppage.

   *ii.*   *Dr. Rodgers and Dr. Nineberg*

   Next, the Court must determine if Dr. Rodgers and Dr. Nineberg are 'similarly situated health care provider[s]" to Dr. Karumanchi and Dr. Paladugu. *See* ALA. CODE § 6-5-548(e). The record indicates that Dr. Rodgers is a licensed psychiatrist in Pennsylvania, New York, New Jersey, and Illinois (inactive), and Dr. Nineberg is a licensed psychiatrist in Massachusetts. *See* Doc. 156-1 at 9, 20. Thus, they both meet the first criterion under subsection (b). *See* ALA. CODE § 6-5-548(b)(1).

   The second criterion requires Dr. Rodgers and Dr. Nineberg to have training and experience in the same discipline or school of practice. ALA. CODE § 6-5-548(b)(2). To testify about the breach of the standard of care in this case, Dr. Rodgers and Dr. Nineberg must have training and experience in psychiatric medical care. Dr. Rodgers' curriculum vitae indicates that she received a Bachelor of Arts ("B.A.") with Honors from University of Illinois, Chicago in 1970, and a Doctor of Medicine ("M.D.") from Rush University Medical School in 1980. *See* Docs. 156-1 at 8. Dr. Rodgers has approximately 23 years of experience as professor in psychiatry and human behavior, 16 years in solo private

practice in psychiatry, plus additional years as a staff, attending, and consulting psychiatrist at various hospitals. *See* Doc. 156-1 at 8-9. Additionally, Dr. Rodgers continues to lecture on psychiatry and mental health, serves in editorial positions with two psychiatry journals, among others. *Id.* Dr. Nineberg received a Bachelors of Science in Biology ("S.B.") from Massachusetts Institute of Technology in 1973, and a Doctor of Medicine from Emory University School of Medicine in 1977. *See* Doc. 156-1 at 20. Dr. Nineberg has approximately 33 years of experience as a staff, private practice, and consulting physician in psychiatry, as well as 15 years as lecturer and 4 years as a professor at Harvard Medical School. *See* Doc. 156-1 at 21. Dr. Nineberg also regularly attends continuing education conferences and courses in psychiatry, and has been a presenter at numerous seminars and lectures. *See* Doc. 156-1 at 21-24. Thus, the Court finds that Dr. Rodgers and Dr. Nineberg have the requisite "training and experience" in psychiatric medical care to meet the second criterion under subsection (b). *See* ALA. CODE § 6-5-548(b)(2).

Finally, the third criterion requires that Dr. Rodgers and Dr. Nineberg have "practiced in the same discipline or school of practice during the year proceeding the date that the alleged breach of the standard of care occurred." ALA. CODE § 6-5-548(b)(3). It is undisputed that, in the year prior to the alleged breach, Dr. Rodgers was a clinical assistant professor of psychiatry at University of Pennsylvania Medical School and operated her solo private practice in forensic, adult, and geriatric Psychiatry. *See* Doc. 156-1 at 8-9. It is similarly undisputed that, in the year prior to the alleged breach, Dr. Nineberg was a staff psychiatrist at Mt. Auburn Hospital in Cambridge, Massachusetts and

a clinical instructor in psychiatry at Harvard Medical School.   *See* Doc. 156-1 at 21.   At contention is whether Dr. Rodgers and Dr. Nineberg "practiced in the same discipline or school of practice."   Defendants contend that Dr. Rodgers and Dr. Nineberg have not served in an in-patient psychiatry environment in the year preceding the alleged breach because they served as clinical professors in psychiatry and practiced out-patient psychiatry.   *See* Doc. 134 at 3.

The largest flaw in Defendants' argument is it narrows "*similarly* situated" down to "*identically* situated," and neither the law nor the statute supports such a stance.   For example, Dr. Paladugu argues that Dr. Rodgers is not "similarly situated" because Dr. Paladugu served as a covering psychiatrist for Dr. Karumanchi while he was out of town for a few days.   Dr. Paladugu argues that for Dr. Rodgers to be "similarly situated," she must show that she that she has served as a covering psychiatrist in the year preceding the alleged breach.   The Alabama Supreme Court has consistently refused to narrow their interpretation of the statute in such a manner.   In *Medlin*, the defendant was board certified in family medicine, but he was practicing emergency medicine at the time of the alleged breach.   583 So. 2d at 1294.   Plaintiff's expert witness testified that in the year preceding the alleged breach, he was a clinical professor in emergency medicine and saw "patients who presented in the emergency room and participat[ed] in the diagnosis and the treatment of the patient," as well as worked for his own company.   *Id.* at 1296.   The Court ultimately held[2]:

---

[2] The court's main holding in *Medlin* involved whether the plaintiff's expert witness should be analyzed under subsection (b) or (c), and the holding regarding if he was "similarly situated" was secondary to that holding.

> Although Dr. Borak testified that the majority of his time was spent working with his company, that fact would not disqualify him as an expert witness, because the statute does not specify the amount of time spent practicing or the nature and quality of the practice. Therefore, we hold, for the purposes of determining whether Dr. Borak qualifies as a similarly situated health care provider, that Dr. Borak practiced emergency medicine during the year preceding Dr. Crosby's alleged breach.

*Id.*  Thus, the Court found that a clinical professor in emergency medicine did, in fact, practice emergency medicine.

Clearly, the statute does not require an expert witness to serve in a nearly identical role as the Defendants tend to suggest.  Dr. Rodgers and Dr. Nineberg both saw, diagnosed, and treated psychiatric patients, and have continued to be highly involved in the field of psychiatry by lecturing, attending continuing education course and conferences, and publishing.  Dr. Rodgers and Nineberg meet the requirements of  "similarly situated health care provider[s]," as defined in § 6–5–548(b), and thus, they can testify in this case as expert witnesses on the alleged breach of the standard of care committed by Dr. Karumanchi and Dr. Paladugu.

**B.**     ***Daubert* Motion**

Next, Dr. Karumanchi moves to "preclude the expert testimony" of Dr. Auerbach pursuant to *Daubert*.[3]   *See* Doc. 138.   According to Defendants, the Plaintiff plans to offer Dr. Auerbach for testimony related to causation.   *See* Doc. 138 at 2.   Specifically, Dr. Auerbach is expected to testify that "the initial dose of Lamictal was a contributing factor in the causation of Ms. McBride's condition and delay in treatment contributed to

---

[3] Dr. Karumanchi also filed his *Daubert* motion with respect to Dr. Rodgers and Dr. Nineberg; however, during oral argument Dr. Karumanchi admitted that the exclusion of Dr. Rodgers and Dr. Nineberg are better suited to be analyzed under § 6-5-548(b) of the Alabama Code.   Thus, the Court will not address Dr. Rodgers or Dr. Nineberg under the *Daubert* standard.   Dr. Auerbach, on the other hand, is not offering testimony related to standard of care, thus § 6-5-548(b) is not applicable to his testimony.

increased morbidity, and made the possibility of death more likely." *Id.*   Essentially, Dr. Auerbach has been retained to offer an alternative explanation on what caused Plaintiff's condition.   Defendants assert that the Plaintiff's expert should be excluded because his testimony does not meet the standards set forth in Rule 702 of the Federal Rules of Evidence or under the *Daubert* test.

Defendants contend that Plaintiff's expert witness fails to satisfy the requirements of *Daubert* and Rule 702 of the Federal Rules of Civil Procedure because he is not qualified, his opinion is not sufficiently reliable, and his opinions will not be helpful to the trier of fact.   *See* Doc. 138 at 5-16.   The Eleventh Circuit has held that expert testimony is only admissible under Rule 702 if it satisfies three requirements:

> (1) the expert witness is qualified to testify competently about the matters he intends to address; (2) the methodology used by the expert to reach his conclusion is sufficiently reliable as determined by the sort of inquiry mandated by *Daubert*; and (3) the testimony is relevant in that it assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence and to determine a fact in issue.

*United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir.2004) (quoting *City of Tuscaloosa* v. *Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir.1999)).   To establish a witness as an expert, the proffering party can cite to the following traits: "knowledge, skill, experience, training, or education."   FED. R. EVID. 702.   It must then be determined if the expert witness' testimony is reliable by considering multiple factors such as:

> (1) whether the expert's methodology has been tested or is capable of being tested; (2) whether the technique has been subjected to peer review and publication; (3) the known and potential error rate of the methodology; and (4) whether the technique has been generally accepted in the proper scientific community.

*McDowell v. Brown*, 392 F.3d 1283, 1298 (11th Cir. 2004) (citing *Daubert*, 509 U.S. at 593–94, 113 S.Ct. at 2796-97).   This list of factors is not an exhaustive list nor are any of the factors dispositive, and the court may "consider any additional factors that may advance its Rule 702 analysis."   *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)).

The trial court is granted "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable."   *Kumho Tire Co*, 526 U.S. at 152.   Moreover, Daubert's relevance and reliability analysis "applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' or 'other specialized' knowledge."   *Kumho Tire Co*, 526 U.S. at 141.   The court "*may* consider" one or more of the specific factors listed in *Daubert* but the actual test is left "flexible."   *Kumho Tire Co*, 526 U.S. at 141. (emphasis in original text).   "The burden of establishing qualification, reliability, and helpfulness rests on the proponent of the expert witness..." *Frazier*, 387 F.3d at 1260.   Thus, the court's screening must "ensure that speculative, unreliable expert testimony does not reach the jury under the mantle of reliability that accompanies the appellation expert testimony."   *Rink v. Cheminova, Inc.*, 400 F. 3d 1286, 1291 (11th Cir. 2005).

First, the Court must determine if Dr. Auerbach is "qualified to testify competently about the matters he intends to address."   *Harcros Chems., Inc.*, 158 F.3d at 562. Defendants do not offer up any explanation on why they believe Dr. Auerbach is not qualified other than by stating that he "offers conclusory opinions without providing

scientific basis or insight as to his own qualifications as an expert in this rare occurrence." *See* Doc. 138 at 7.   However, after a review of Dr. Auerbach's curriculum vitae it is clear to this Court that Dr. Auerbach possesses the necessary "knowledge, skill, experience, training, or education" to testify in this matter.   FED. R. EVID. 702.   Dr. Auerbach received a Bachelor of Science in Chemistry at New York University ("NYU") in 1954, and a Doctor of Medicine from NYU's Schools of Medicine in 1958.   *See* Doc. 156-1 at 31.   He is a licensed dermatologist in New York, New Jersey, Illinois, and Wisconsin. *Id.*   He has 51 years in private practice in dermatology and as a clinical professor at NYU's Skin and Cancer Clinic and the Veterans Administration Dermatology Clinics, all practiced concurrently.   *See* Doc. 156-1 at 31-34.   In the same five decade time span, Dr. Auerbacher has also served as an attending, visiting, and consulting physician for numerous hospitals.   *Id.*   He has more than 79 publications in the field of dermatology, and has given numerous lectures and seminars.   *See* Doc. 156-1 at 35-40.   Of particular relevance to this case is that he has published on Toxic Epidermal Necroloysis as far back as 1960[4] and wrote a chapter in *Dermatologic Diagnosis & Treatment* in 2001, entitled "Erythema Multiforme, Stevens-Johnson Syndrome and Toxic Epidermal Necrolysis." *See* Doc. 156-1 at 35, 40.   He was part of a seminar in 2007 on Toxic Epidermal Necrolysis.   *See* Doc. 156-1 at 32.   It is clear to this Court that Dr. Auerbach is qualified to testify competently on the matters at issue in this case.

Second, the Court must determine if "the methodology used by the expert to reach his conclusion is sufficiently reliable."   *Harcros Chems., Inc.*, 158 F.3d at 562.

---

[4] This was actually Dr. Auerbach's very first publication.   *See* Doc. 156-1 at 40.

Throughout their argument on this issue, Defendants continually cite to the superiority of their own evidence and theory over that of the Plaintiff as a basis to show that the Plaintiff's expert does not meet this factor of the *Daubert* standard.  For example, the Defendants spend the bulk of their argument laying out the opinions of their own experts, Dr. Steven Myers and Dr. Andrew Muzyk.  *See* Doc. 138 at 9.  Dr. Myers and Dr. Muzyk opine that Dr. Auerbach's opinion is "speculative and unreliable" and claim that the reports of complications have been rare and that "the black box warnings are often provided because of a perceived or suspected potential association that is not understood or proven by medical science."  *See* Doc. 138 at 9-10.  They further lay out Dr. Myers and Dr. Muzyk's opinion on what might have been the cause of McBride's reaction.  *See* Doc. 138 10-12.

The Eleventh Circuit has held that "[i]ssues concerning the credibility of witnesses and weight of the evidence are questions of fact which require resolution by the trier of fact."  *Tippens v. Celotex Corp.*, 805 F.2d 949, 954 (11th Cir. 1986).  "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  *Daubert*, 509 U.S. at 596, 113 S. Ct. at 2798.  Defendants will have the opportunity to cross-examine Plaintiff's expert witness in order to test his credibility and differing opinions in front of the jury.  The Court finds the arguments that the experts should be excluded based solely on the Defendants' interpretation of the cause of the reaction giving rise to this action is insufficient.  There is a range in which different expert witnesses may reasonably differ.  *Kumho Tire Co.*, 526 U.S. at 153, 119 S.Ct. at 1177

(citing *Daubert*, 509 U.S. at 596, 113 S.Ct. at 2798).   Simply asserting that Plaintiff's expert uses methods that do not conform with Defendants' experts does not make them faulty.   *Id.*   The Supreme Court has recognized that experts may reasonably differ on issues of science and conclusions, but that these differences should be admitted to aid the trier of fact in deciding the issues.   *Kumho Tire Co.*, 526 U.S. at 153; *see also Globetti v. Sandoz Parm.* Cor., 111 F.Supp.2d 1174, 1177 (N.D. Ala. 2000) (stating that it is the role of the finder of fact, not the judge, to decide whether an expert's opinion is correct).

Defendants also argue that there is no evidence that Dr. Auerbach has "performed any independent research, authored any articles, or given any lectures on these subjects." *See* Doc. 138 at 12.   However, as stated above, at the very least as far back as 1960 and as recently as 2007, Dr. Auerbach has been published on both Stevens-Johnson Syndrome and Toxic Epidermal Necrolysis, as well as being a part of a seminar on the subject.   *See* Doc. 156-1 at 32, 35, 40.

Additionally, Defendants argue that according to their experts the potential link between Lamictal and Stevens-Johnson Syndrome and Toxic Epidermal Necrolysis is not proven by medical science and the condition is of speculative nature.   *See* Doc. 138 at 13. The Court finds this argument lacking, especially considering Defendants' own expert witnesses would be disqualified from testifying under this theory.   If there is a speculative nature around the condition at issue in this case, then that would indicate that *all* expert testimony should be disqualified under the *Daubert* standard and not just Plaintiff's expert. Although the connection between Lamictal and the cause of Stevens-Johnson Syndrome and Toxic Epidermal Necrolysis is still a developing area in medicine, the analysis of

whether Dr. Auerbach's opinion is reliable can only be done based on what the medical research currently shows.

After reviewing the Plaintiff's opposition brief, as well as considering the oral arguments on the motion, the Court finds that the Plaintiff's expert bases his opinion on sufficiently reliable methods.

Finally, the Court must determine if "the testimony is relevant in that it assists the trier of fact." Defendants argue that Dr. Auerbach offers nothing more than "blanket, "generalized, and conclusory statements." *See* Doc. 138 at 15. However, that is not within the analysis that the Court has to make under this factor. The consideration of whether the expert witness' testimony is helpful to the trier of fact "goes primarily to relevance." *Daubert,* 509 U.S. at 591, 113 S.Ct. 2786. "Expert testimony which does not relate to any issue in the case is not relevant, and, ergo, non-helpful." *Frazier,* 387 F.3d at 1262 (citation and internal quotation marks omitted). In other words, "expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." *Id.* at 1262–63. Expert testimony also does not help the trier of fact if it fails to "fit" with the facts of the case. *McDowell v. Brown,* 392 F.3d 1283, 1299 (11th Cir.2004). This occurs when "a large analytical leap must be made between the facts and the opinion." *Id.* The court may exclude otherwise reliable testimony if it does not have "sufficient bearing on the issue at hand." *Bitler v. A.O. Smith Corp.,* 391 F.3d 1114, 1121 (10th Cir.2004). Expert testimony is additionally helpful "if it concerns matters that are beyond the understanding of the average lay person." *Frazier,* 387 F.3d at 1262.

Dr. Auerbach's testimony is clearly relevant, and obviously fits the facts of this case without any analytical leap. His medical opinion speaks directly to the facts of this case as derived from McBride's medical records. Defendants have not convinced the Court that Dr. Auerbach would detract in any way from the trier of fact's ability to ultimately decide the case. The Court finds that the Defendants primary argument is that they disagree with the Plaintiff's experts' opinions. The Defendants are free at trial to argue against any opinions and conclusions reached by Plaintiff's experts, as well as present evidence of their own theories, reinforcing the ruling of courts that "the weaknesses in the underpinnings of the expert's opinions go to its weight rather than its admissibility." *Jones v. Otis Elevator Co.*, 861 F. 2d 655, 663 (11th Cir. 1988).

## C.    Rule 26 Expert Reports

Finally, Defendants object to the Plaintiff's Rule 26 expert disclosures for Dr. Nineberg and Dr. Rodgers. *See* Docs 109 at 1; 110 at 1-3; 136 at 6. Defendants object to Dr. Nineberg's Rule 26 disclosure because his written report is facially noncompliant with the Federal Rules of Civil Procedure, and to Dr. Rodgers Rule 26 disclosure because in her written report she criticizes Dr. Paladugu and Dr. Karumanchi for acts and/or omissions that were not expressly and specifically alleged in Plaintiff's Complaint. *See* Docs. 70; 109-110; 136. Subsection (2)(B) of Rule 26 of the Federal Rules of Civil Procedure provides the guideline for the content that must be included in a written report that accompanies the party's expert disclosure:

> (B) *Witnesses Who Must Provide a Written Report*. Unless otherwise stipulated or ordered by the court, this disclosure must be accompanied by a written report--prepared and signed by the witness--if the witness is one

retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony. The report must contain:

> (i) a complete statement of all opinions the witness will express and the basis and reasons for them;
>
> (ii) the facts or data considered by the witness in forming them;
>
> (iii) any exhibits that will be used to summarize or support them;
>
> (iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;
>
> (v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and
>
> (vi) a statement of the compensation to be paid for the study and testimony in the case.

FED. R. CIV. P. 26(2)(B).

Upon review of Dr. Nineberg's written report, it is immediately clear to this Court that it is not compliant with the requirements of Rule 26(2)(B). *See* Doc. 110-1 at 2. The report is a page and a half with a list of materials Dr. Nineberg used to come to his conclusions, and a single paragraph generally stating what he believes to have been the breaches of the standard of care in this case. *See* Doc. 110-1 at 2-3. Dr. Nineberg concluded his opinion by stating that "[t]he above-described opinions are not intended to be a complete summary of deviations from the standard care and are subject to revision." *See* Doc. 110-1 at 3. To date, no such revision has been provided to the Defendants. Dr. Nineberg clearly did not present a "complete statement," and accordingly Dr. Nineberg must provide a supplement to his written report that fully complies with Rule 26 as further set out below. Plaintiff is hereby warned that if Dr. Nineberg fails to supplement his

written report, this Court will strike Dr. Nineberg as an expert witness.   Additionally, at the Defendants request, Defendants' experts shall be granted an opportunity supplement their written reports to incorporate the new opinions set forth in Dr. Nineberg's supplemented written report.

Defendants also object to Dr. Rodgers Rule 26 disclosure because in her written report she criticizes Dr. Paladugu and Dr. Karumanchi for acts and/or omissions that were not expressly and specifically alleged in Plaintiff's Complaint.  *See* Docs. 70; 109-110. Defendants state that pursuant to § 6-5-551 of the Alabama Code, a plaintiff is prohibited from conducting discovery on any alleged act or omission that is not properly pled in the complaint with "detailed specification and factual description of each act or omission. *See* Docs. 109 at 2; 110 at 2-3.   However, despite two separate defendants filing a motion for this same relief, neither of them provided any description of the excessive alleged acts and/or omissions in Dr. Rodgers' report, nor was it argued at the hearing.   A general statement and citation to the law without any application to the facts of this case is not a sufficient argument before this Court.   If Defendants wish to refile their motion with more specificity, the Court will take up the issue at that time.   Accordingly, at the present time the motions are due to be denied.

## II.   CONCLUSION

Accordingly, upon consideration of the motions, for the reasons as stated, and for good cause, it is ORDERED as follows:

(1)   Defendants' *Motion to Strike the Testimony and/or Opinion of Plaintiff's Expert Carol E. Dankin* (Doc. 133), and *Motion to Strike and Exclude Testimony of Carol*

*Dakin PhD, RN* (Doc. 134) be and are hereby DENIED.

(2)     Defendants' *Motion in Limine to Exclude or Limit Testimony From Plaintiff's Experts* (Doc. 136), *Motion to Strike and Preclude Expert Testimony of Dr. Carla Rodgers, Dr. Allan Nineberg, and Dr. Robert Auerbach* (Doc. 138), and *Supplemental Motion in Limine to Exclude or Limit Testimony From Plaintiff's Experts* (Doc. 151) be and are hereby DENIED.

(3)     To the extent that Defendants request that Dr. Nineberg be stricken as an expert witness, the *Motion to Strike* (Doc. 109), *Motion to Strike* (Doc. 110), *Motion in Limine to Exclude or Limit Testimony From Plaintiff's Experts* (Doc. 136), and *Supplemental Motion in Limine to Exclude or Limit Testimony From Plaintiff's Experts* (Doc. 151) be and are hereby DENIED.

(4)     To the extent Defendants request that Dr. Nineberg supplement his written report, the *Motion to Strike* (Doc. 109), *Motion to Strike* (Doc. 110), *Motion in Limine to Exclude or Limit Testimony From Plaintiff's Experts* (Doc. 136), and *Supplemental Motion in Limine to Exclude or Limit Testimony From Plaintiff's Experts* (Doc. 151) be and are hereby GRANTED.   Dr. Nineberg shall supplement his report within seven (7) days of the date of this order.   Defendants' experts shall have fourteen (14) days from the date that Plaintiff submits Dr. Nineberg's supplemented written report, to supplement their written reports.

(5)     To the extent that Defendants request that the Plaintiff be prohibited from conducting discovery on issues contained in Dr. Rodgers' expert report that exceed the scope of the Plaintiff's complaint, the *Motion to Strike* (Doc. 109), and *Motion to Strike*

(Doc. 110) be and are hereby DENIED.

DONE this 3rd day of September, 2014.

/s/Terry F. Moorer
TERRY F. MOORER
UNITED STATES MAGISTRATE JUDGE