IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, SOUTHERN DIVISION


| | | |
|---|---|---|
| COURTNEY McBRIDE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 1:12cv1047-MHT |
| | ) | (WO) |
| HOUSTON COUNTY HEALTH CARE | ) | |
| AUTHORITY d/b/a Southeast | ) | |
| Alabama Medical Center, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |


OPINION AND ORDER

Plaintiff Courtney McBride developed a rare skin

disease after receiving treatment at a county hospital

followed by her subsequent discharge to a local jail.

She brings this civil action against the following

defendants: Houston County Health Care Authority; Drs.

Dinesh Karumanchi and Rajendra Paladugu; the City of

Dothan; and Dothan City Jail Correctional Officers

Mamie McCory and Stephanie Johnson.  She asserts that

the Health Care Authority and the doctors committed medical malpractice in violation of Alabama law, and she further claims that the City of Dothan and its correctional officers were deliberately indifferent to her medical needs in violation of the United States Constitution and were negligent in violation of Alabama law.  The court has jurisdiction pursuant to 28 U.S.C. § 1343(a)(3) (civil rights) and § 1367 (supplemental).

The case is before the court on defendant Karumanchi's motion to exclude the expert opinions of Dr. Robert Auerbach, Dr. Carla Rodgers, and Dr. Allan Nineberg.  The motion will be denied.

Relying on Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993), Karumanchi challenges Drs. Nineberg and Auerbach's qualifications and methodology; he also challenges Dr. Rodgers's qualifications to testify under Alabama medical-malpractice law.  At the outset, the court notes that the magistrate judge already issued an opinion denying Karumanchi's earlier motion

to exclude the expert opinions of Auerbach, Rodgers, and Nineberg, in which he discussed each experts' qualifications as well as Auerbach's methodology for determining causation. See McBride v. Houston Cnty. Health Care Auth., 2014 WL 4373187 (M.D. Ala. 2014) (Moorer, M.J.). Because Karumanchi did not object to the magistrate judge's opinion, the decision is binding, as "a party may not assign as error a defect in the order not timely objected to." Fed. R. Civ. P. 72(a). Because his motion therefore is not properly before this court, it is due to be denied. Indeed, if Karumanchi could bring successive Daubert motions, he would lack an incentive to complete his due diligence before filing and to make timely objections to the magistrate judge.

Nevertheless, the court will address Karumanchi's arguments on the merits below, as an alternative basis for denying his motion. Because the court agrees with the magistrate judge's opinion, it will not rehash what

has already been covered but rather will focus on Karumanchi's arguments based on the new information not available at the time of the magistrate judge's opinion.

## I.  DAUBERT CHALLENGES TO DOCTORS NINEBERG AND AUERBACH

The court first will lay out the legal standard for evaluating expert testimony.  It will then address two general arguments made against Drs. Nineberg and Auerbach and last will move to specific criticisms of each expert's opinion.

### A. Legal Standard

The Federal Rules of Evidence govern the admissibility of expert testimony.  See Daubert, 509 U.S. at 587.  Rule 702 provides:

> "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

4

a. The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

b. The testimony is based on sufficient facts or data;

c. The testimony is the product of reliable principles and methods; and

d. The expert has reliably applied the principles and methods to the facts of this case."

Fed. R. Evid. 702. The trial court must serve as a gatekeeper for expert-witness testimony. Daubert, 509 U.S. at 597. Doing so requires the court to make both a "relevance" and a "reliability" determination, disallowing expert testimony that is either unreliable or unhelpful to the trier of fact. Id. at 589.

The Supreme Court has provided a non-exclusive list of factors to guide the trial judge's Rule 702 determination, including: whether a theory or technique can be or has been tested; whether a theory or technique has been subjected to peer review or

5

publication; whether a theory or technique has gained widespread acceptance within the relevant community of experts, or, rather, has been unable to garner more than minimal support; and the known or potential rate of error of a technique. <u>Id</u>. at 593-94. These factors are not a "definitive checklist," but are considerations that may shape the trial judge's "flexible inquiry" under Rule 702. <u>Id</u>. at 594; <u>see also</u> <u>United States v. Brown</u>, 415 F.3d 1257, 1267-68 (11th Cir. 2005) (citing <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137, 149 (1999) and explaining that "<u>Daubert</u>'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case" and that "the question of whether <u>Daubert</u>'s specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine" (internal citations omitted)). Consistent with this understanding, the Rule 702 advisory committee notes

6

explain that, while the Rule's current iteration endorses the <u>Daubert</u> conception of the trial judge as a gatekeeper, Rule 702 was not intended to "codify" the specific factors mentioned in <u>Daubert</u>.

Therefore, Rule 702 makes clear that this court is "<u>obliged</u> to screen expert testimony to ensure it stems from, not just a reliable methodology, but also a sufficient factual basis and reliable application of the methodology to the facts." <u>Rudd v. Gen. Motors Corp.</u>, 127 F. Supp. 2d 1330, 1337 (M.D. Ala. 2001) (Thompson, J.) (emphasis in original). In doing so, however, trial judges must avoid several pitfalls. First, they should not confuse this sufficiency-of-basis inquiry under Rule 702 with the sufficiency-of-the-evidence inquiry in summary-judgment analysis. <u>Id</u>. at 1336 n.5. Indeed, the two inquiries are "formally quite distinct ... that is, Rule 702 mandates a determination of whether the expert had sufficient evidence (evidence which itself may or may

7

not be admissible) to support his or her testimony, not a determination of whether that testimony standing alone provides sufficient evidence to allow a reasonable fact-finder to find for the plaintiff on an issue of substantive law." <u>Id</u>.   Relatedly, in carrying out their gate-keeper obligation under Rule 702, trial judges must not usurp the role of the trier of fact:

> "[Rule 702] is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other.... [T]he rejection of expert testimony is the exception rather than the rule. <u>Daubert</u> did not work a seachange over federal evidence law, and the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system.   Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."

Fed. R. Evid. 702, advisory committee notes, 2000 amendment (internal citations omitted).

To meet this obligation, the Eleventh Circuit Court of Appeals has instructed trial courts to "engage in a rigorous three-part inquiry," in which the trial court considers whether: "(1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable...; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue." Rosenfeld v. Oceania Cruises, Inc., 654 F.3d 1190, 1193 (11th Cir. 2011) (internal citations omitted). The burden is on the proponent of expert testimony to establish that those requirements have been met by a preponderance of the evidence. See Kilpatrick v. Breg, Inc., 613 F.3d 1329, 1335 (11th Cir. 2010).

## B. Defendant Karumanchi's General Arguments

Defendant Karumanchi presents two sweeping criticisms of Drs. Nineberg's and Auerbach's opinions: that they failed to show the exact mechanism of how a higher dosage of Lamictal causes Stevens-Johnson Syndrome (SJS) or Toxic Epidermal Necrolysis (TEN) and that they failed to present a double-blind scientific study proving causation.  Neither argument comports with the dictates of <u>Daubert</u> or the realities of modern science.

First, Karumanchi emphasizes that neither Nineberg nor Auerbach can describe the mechanism by which Lamictal or a higher dosage of Lamictal causes SJS or TEN and that their opinions should therefore be excluded.  This argument is wrong as a matter of law. <u>See, e.g.,</u> <u>In re Chantix (Varenicline) Products Liab.</u> <u>Litig.</u>, 889 F. Supp. 2d 1272, 1301-02 (N.D. Ala. 2012) (Johnson, J.) ("Absent is any argument that the plaintiff must prove the biological means of injury,

because no such requirement exists. ... Although the plaintiffs must prove specific causation, to the satisfaction of the trier of fact, this is not analogous to proving the specific bodily interaction or mechanism which underlies that causation."); <u>In re Traylsol Products Liab. Litig.</u>, 2010 WL 4102247, at *4 (S.D. Fla. 2010) (Middlebrooks, J.) (same); <u>In re Seroquel Products Liab. Litig.</u>, 2009 WL 3806435, at *8 (M.D. Fla. 2009) (Conway, J.) (same).  Indeed, such a stringent standard would eliminate testimony on even well known cause-effect relationships.  For example, Nineberg testified: "In my field, we basically don't know much of anything about why antidepressants or antipsychotics work. But if you look at thousands of patients and you do these placebo-controlled studies, there's no question that some groups get better and some groups don't. And the mechanisms are continually being researched. So we have ideas about them, but

11

we're not there yet." March 18 <u>Daubert</u> hearing (doc.
no. 260) at 54:4-11.[1]

Karumanchi next argues that, even if McBride does
not have to prove the exact mechanism, Nineberg and
Auerbach's admission that no double-blind study
confirms causation requires the exclusion of their
opinions. Case law, again, rejects this argument. In
<u>Gess v. United States</u>, 991 F. Supp. 1332, 1339-1340
(M.D. Ala. 1997) (DeMent, J.), the court confronted a
case where there was no conclusive clinical study on
the cause-and-effect mechanism of a particular drug,
and most of the articles supporting the expert's theory
relied on animal testing. <u>Id</u>. Nevertheless, the court
noted that a conclusive clinical study was not needed
as long as the expert used a reliable methodology to

_____

1. In the second <u>Daubert</u> hearing, Auerbach
testified to several theories about the mechanism by
which Lamictal causes SJS and TEN and cited several
studies. <u>See</u> April 13 <u>Daubert</u> hearing (doc. no. 263)
at 31:18-32:11. Because McBride does not have to show
the exact mechanism, the court does not address
Auerbach's theory here.

make conclusions from known information, because
"[s]uch a study would be unethical under the tenets of
modern medicine." Id. at 1339; see also Adams v.
Hooper, 2013 WL 5777032, at *6 (N.D. Ala. 2013)
(Coogler, J.) ("[J]ust because a theory is untestable
does not necessarily make it unreliable, but it does
require the Court to be more searching in its analysis
of reliability."). Nineberg and Auerbach testified
that such a double-blind study would also be unethical
in this case, and Karumanchi does not dispute this
conclusion in his briefing. Unethical human testing is
not a prerequisite under Daubert. The court therefore
rejects Karumanchi's position.[2]

_____

2. Karumanchi also argues that his expert on the
issue shows that Nineberg's and Auerbach's positions on
causation are "speculative and unreliable." Mot. to
Strike and Preclude Expert Testimony (doc. no. 138) at
9-10.   As the magistrate judge noted, however,
"[v]igorous cross-examination, presentation of contrary
evidence, and careful instruction on the burden of
proof are the traditional and appropriate means of
attacking shaky but admissible evidence." McBride,
2014 WL 4373187, at *8 (quoting Daubert, 509 U.S. at
(continued...)

## C. Dr. Nineberg

Defendant Karumanchi first argues that Dr. Nineberg does not have the qualifications to be an expert on causation in this case. In particular, he argues that, because Nineberg is not an expert on SJS or TEN and has not been involved in any research on the subject, he cannot be an expert on whether Lamictal causes SJS or whether McBride's taking Lamictal caused her SJS. The court disagrees.[3]

On the question of his qualifications, the court starts with Nineberg's past experience as a psychiatrist. The magistrate judge's opinion covers

_____

596). Put differently, the court will not exclude experts simply because the opposing party has experts that come to different conclusions.

3. Karumanchi also argues that Nineberg was not disclosed as a causation expert or, put another way, that his second supplemental report with a causation opinion included was untimely. The court will address this argument in its opinion on summary judgment.

14

Nineberg's resume in depth, so it will not be rehashed here.  Importantly, though, Nineberg emphasized in the Daubert hearing that he routinely prescribes Lamictal in his practice; his primary work at this point is in psychopharmacology--that is, "the study of the use of medication treating mental disorders"; and he is a member of the American Society of Clinical Psychopharmacology.  March 18, 2015 Daubert hearing (doc. no. 260) at 9:12-10:14.  As a psychopharmacologist, he specializes in "what the body does to medication ... [and] what medications do to the body."  Id.

While Karumanchi admits that this qualifies Nineberg to testify as to the standard of care on what dosage of Lamictal should be administered, id. at 89:12-17, he argues that Nineberg cannot address causation because there is a difference between heeding warnings and understanding causation.  The court doubts the general principle Karumanchi proposes that an

expert in the standard of care necessarily needs
additional expertise to understand causation, and, in
any event, does not believe it applies here.

First, the court agrees with Nineberg's general
principle that, "If you're a physician and treating
sick patients, you need to be responsible for the use
of medication, you need to understand adverse effects,
and you need to know if there are reasons to exceed a
particular recommendation, and you need to know
something about the risks. It's appropriate and within
my knowledge base to be able to read the medical
literature." Id. at 90:15-22. Because Nineberg
routinely prescribes Lamictal and has the medical
background and degree to do so, he has the expertise to
read the literature on the drug and understand its
potential effects. The question of whether he relied
on the right literature goes towards his methodology
rather than his qualifications.

16

Regardless of the general principle, Nineberg qualifies as an expert based on his work. He not only prescribes Lamictal regularly but also devotes a large portion of his work to understanding psychopharmacology. He has read the literature on Lamictal and has relied on the knowledge of its potential side effects in prescribing it to patients.

The next question is whether Nineberg is qualified to testify that McBride's increased dosage of Lamictal caused the development of SJS or TEN. Karumanchi points out that Nineberg is not a dermatologist and cannot diagnose SJS or TEN. The court agrees with this argument, as far as it goes. Nineberg is not qualified to identify SJS from pictures or treat it, and he admits as much. See id. at 90:23-25 ("I don't know about skin rashes. If I see one, I'll send a patient to the emergency room probably."). However, after another doctor's diagnosis SJS or TEN, Nineberg is qualified to testify on why Lamictal caused it as

17

opposed to another drug or cause because he can eliminate other causes by examining the patient's history. The court therefore finds that Nineberg is qualified to testify to both general and specific causation.

Karumanchi next challenges Nineberg's methodology as unreliable. "Accordingly the court must first identify the basis of [Dr. Nineberg's] testimony and then decide whether the methods, procedures and information used by [him] to reach his conclusions are scientifically reliable." Gess, 991 F. Supp. at 1338.

In forming his opinion, Nineberg considered the medical records and depositions in the case, his experience prescribing Lamictal in his practice, and several articles he either read in the past or reviewed for this case. He admits that no double-blind scientific studies have "conclusively establish[ed]" that higher initial dosages of Lamictal cause SJS or TEN. However, "as the Daubert Court noted, the subject

18

of an expert's testimony need not be known to a certainty for that testimony to be admissible. For Dr. [Nineberg]'s testimony to be admissible, he must take <u>what is known</u>, however large or small that body of knowledge may be, and draw his conclusions from that knowledge using the scientific method." <u>Id</u>. at 1339 (emphasis in original) (internal citation omitted).

What, then, did Dr. Nineberg know? <u>Id</u>. First, he knew from the studies he read that Lamictal could cause SJS and TEN. As to the studies, he first cited the study "Factors Influencing the Incidence of Lamotrigine-Related Skin Rash" by Ian Wong and several others in the Annals of Pharmacotherapy ("Wong study"). <u>See</u> Wong Study (doc. no. 203-14) at 36. The Wong study tracked 800 people using lamotrigine before and after the recommended starting dosage was changed from 50mg to 25mg.[4] <u>Id</u>. at 36-37. It found that before the change, 12 patients had serious rash, including two

---

4. Lamictal is a brand name for lamotrigine.

with SJS.  Id. at 37-38.  After, the rate of serious
rash was significantly reduced.  Id. at 40.  The study
noted that this difference was statistically
significant.  Id. at 38.

Nineberg next pointed to a study on the "Risk of
Stevens-Johnson Syndrome and Toxic Epidermal Necrolysis
in New Users of Antiepileptics" by Dr. Maja Mockenhaupt
and others in the journal Neurology ("Mockenhaupt
study"), which examined a large, German health registry
to understand the incidence of SJS and TEN from several
drugs over a number of years.  See Mockenhaupt Study
(doc. no. 203-14) at 30.  According to the study, the
cases of SJS and TEN from Lamictal peaked in 1993
before a recommended change in dosage and decreased
significantly during the following years despite an
increased use of Lamictal.  Id. at 32.  In the Daubert
hearing, Nineberg explained that the data showed a
decrease in SJS and TEN rates from a rate of 8 in
10,000 patients taking lamotrigine to 1.6 in 10,000

patients.   March 18 <u>Daubert</u> hearing (doc. no. 260) at 30:18-25.[5]

Nineberg last cited "The Effect of Dermatologic Precautions on the Incidence of Rash with Addition of Lamotrigine in the Treatment of Bipolar I Disorder: A Randomized Trial" by Dr. Terence A. Ketter and others in the Journal of Clinical Psychiatry ("Ketter Study"), which also noted that serious rash occurs more frequently at higher dosages.   Ketter Study (doc. no. 203-14) at 23.

Nineberg confirmed that the Ketter study was published in a peer-reviewed journal and stated that he believed the Wong and Mockenhaupt studies were also in peer-reviewed journals.   The court credits this

---

5. The study does note, "While the registry data cannot be used to test hypotheses about SJS and TEN, this temporal pattern is consistent with other observations that suggest that dosing is a risk factor for SJS and TEN in new users of [lamotrigine]."   <u>See</u> Mockenhaupt Study (doc. no. 203-14) at 33.   This appears to be an acknowledgement that this is not a double-blind study, a shortcoming of the available scientific research which is addressed above.

testimony, as it has no reason to doubt Nineberg. Karumanchi did not bring out that any of these journals were not peer-reviewed in the depositions, briefing, or cross-examination in the Daubert hearing.  Given these three articles, and the testimony of both Nineberg and Auerbach, the court concludes that theirs is not a niche view with minimal support but rather one with wide support in the relevant community of experts.  See Hendrix v. Evenflo Co., 255 F.R.D. 568, 599 (N.D. Fla. 2009) (Rodgers, J.) ("[M]edical literature can show that a particular theory has gained general acceptance in the relevant medical community, provided the literature offers reliable data in support."), aff'd sub nom. Hendrix ex rel. G.P. v. Evenflo Co., 609 F.3d 1183 (11th Cir. 2010).

With the articles providing the scholarly background, Nineberg also examined the medical records and depositions.  Taking the diagnosis of SJS and TEN

from the medical records, he used differential diagnosis to find that Lamictal was the probable cause.

"Differential diagnosis is accomplished by determining the possible causes for the patient's symptoms and then eliminating each of these potential causes until reaching one that cannot be ruled out or determining which of those that cannot be excluded is the most likely." Guinn v. AstraZeneca Pharm. LP, 602 F.3d 1245, 1253 (11th Cir. 2010) (internal quotation marks omitted). Under this method, an expert "must provide a reasonable explanation as to why he or she has concluded that [any alternative cause suggested by the defense] was not the sole cause of the plaintiff's injury." Id. at 1253 (internal quotation marks omitted); see also Wilson v. Taser Int'l, Inc., 303 Fed. App'x 708, 714 (11th Cir. 2008) ("Although a medical expert need not rule out every possible alternative in order to form an opinion on causation, expert opinion testimony is properly excluded as

23

unreliable if the doctor engaged in very few standard diagnostic techniques by which doctors normally rule out alternative causes and the doctor offered no good explanation as to why his or her conclusion remained reliable or if the defendants pointed to some likely cause of the plaintiff's illness other than the defendants' action and [the doctor] offered no reasonable explanation as to why he or she still believed that the defendants' actions were a substantial factor in bringing about that illness.").

Nineberg engaged in an adequate differential diagnosis here. He used the Algorithm of Drug Causality for Epidermal Necrolysis (ALDEN) to evaluate whether Lamictal caused McBride's SJS and TEN and found that it did. While there is some question whether ALDEN considers idiopathic causes for SJS and TEN, McBride presented sufficient evidence with Nineberg's testimony and the "UptoDate" article, March 18 <u>Daubert</u> Hearing Pl. Ex. 11 ("Stevens-Johnson Syndrome and Toxic

24

Epidermal       Necrolysis:       Pathogenesis,       Clinical
Manifestations,  and  Diagnosis"),  demonstrating  that
this method is used in the general scientific community
to diagnose the cause of SJS/TEN.

In sum, the court finds Nineberg's qualifications
acceptable  and  his  methodology  reliable  on  both
standard of care and causation.  His testimony will not
be excluded.


D. Dr. Auerbach

Karumanchi first challenges the magistrate judge's
conclusion that Dr. Auerbach is qualified to testify
whether a higher dosage of Lamictal caused McBride's
SJS  and  TEN.   Specifically,  he  argues  that  the
magistrate  judge  relied  on  a  book  chapter  Auerbach
published on SJS and TEN to find that Auerbach was
qualified, but that Auerbach has since stated that the
published      chapter      was      not      an      authoritative
dermatological  text  and  that  the  publisher  changed

25

Auerbach's manuscript for the chapter without telling him. Auerbach Dep. (doc. no. 195-1) at 95:14-97:19. In other words, Karumanchi argues that, without the book chapter, Auerbach is unqualified.

The court is unpersuaded. The magistrate judge provided a long description of Auerbach's qualifications, including his 50 years in dermatology as a private practitioner and professor as well as his numerous publications in the field. Auerbach also has diagnosed and/or treated around 25 patients with SJS or TEN during his career, which is noteworthy given the rareness of the disease. The fact that Auerbach discounts his book chapter does not negate his long history of diagnosis of SJS and TEN and in dermatology in general.

Defendant Karumanchi next challenges Auerbach's methodology in concluding that higher dosages of Lamictal cause SJS and TEN in general and in this case. As to general causation, Auerbach's experience in

diagnosing SJS or TEN, his citation to the Wong and
Mockenhaupt articles, and his 50 years in the field
make his testimony reliable.[6]   As to causation in this
case, Auerbach found that the higher dosage of Lamictal
caused McBride's SJS.   Although he did not use the
ALDEN formula as Nineberg did, he provided a rationale
for eliminating other causes.   He rejected infection or
virus because these causes have only been known to lead
to SJS and not the more severe TEN, with which McBride
was diagnosed.   He also mentioned a February 2015 paper
debunking the link between viruses and SJS.   April 13
Daubert hearing (doc. no. 263) at 12:3-15.   Next, as
did Nineberg, he noted that "no knowledgeable set of
doctors,   no   medical   concurrence,   no   teaching
conference" would consider Flagyl as a cause where the

---

6.   Auerbach did not appear to cite the Wong and
Mockenhaupt articles directly in his deposition, but
instead referred to "the literature" writ large.
Later, in the Daubert hearing, Auerbach clarified this
reference to "the literature" by citing directly to the
articles.

patient had been taking 50mg of Lamictal consistently. <u>Id</u>. at 11:11-20; 41:2-5.   He also noted that the published attribution of Flagyl as a cause of SJS or TEN came in an isolated case report, which certainly does not establish it as a probable cause of SJS or TEN.   <u>Id</u>. at 43:7-9.   Finally, he rejected any idiopathic, or unknown spontaneous, cause because he believes these diagnoses are a result of poor medical history and, in his 50-year career, has never observed one.   This reasoned breakdown of the his method for rejecting the other potential causes is far from the situation in the unpublished case cited by defendants, <u>Brown v. Roche Labs., Inc.</u>, 567 Fed. App'x 860, 863 (11th Cir. 2014), in which the expert admitted during the deposition that the defendant was exposed to two drugs during the relevant time frame, and either could have caused SJS or TEN.   Indeed, Auerbach has been consistent and adamant that other explanations have no basis in science or common sense.

In sum, the court finds Auerbach's qualifications acceptable and his methodology reliable.  His testimony will not be excluded.

## II. ALABAMA-LAW-BASED CHALLENGE TO DR. RODGERS

In addition to the <u>Daubert</u> challenges, Karumanchi renews his challenge to Dr. Rodgers's qualifications under an Alabama law requiring that an expert be a "similarly situated healthcare provider" to the defendant.  1975 Ala. Code § 6-5-548.[7]  He argues that

---

7.  Karumanchi contends that the magistrate judge erred by analyzing this comparison under § 6-5-548(b) rather than § 6-5-548(c).  Because the court finds that Rodgers is qualified under either standard, it will adopt Karumanchi's position for purpose of argument. 1975 Ala. Code § 6-5-548(c) states:

> "Notwithstanding any provision of the Alabama Rules of Evidence to the contrary, if the health care provider whose breach of the standard of care is claimed to have created the cause of action is certified by an appropriate American board as a specialist, is trained and experienced in a medical specialty, and holds

(continued...)

Rodgers is not similarly situated because her psychiatry practice was in an outpatient setting while Karumanchi practiced in a hospital. For support, he relies on Holcomb v. Carraway, 945 So. 2d 1009 (Ala. 2006). This reliance is misplaced.

Holcomb involved a plaintiff suing her surgeon for "negligently fail[ing] to perform a biopsy ... at the proper time," and her radiologists for misreading

---

himself or herself out as a specialist, a 'similarly situated health care provider' is one who meets all of the following requirements:

(1) Is licensed by the appropriate regulatory board or agency of this or some other state.

(2) Is trained and experienced in the same specialty.

(3) Is certified by an appropriate American board in the same specialty.

(4) Has practiced in this specialty during the year preceding the date that the alleged breach of the standard of care occurred."

mammograms. <u>Id</u>. at 1011, 1014. The plaintiff offered
two expert witnesses: one for the surgeon and one for
the radiologists. The expert testifying about the
surgeon was a doctor who was board-certified in
internal medicine, hematology, and medical oncology but
was not certified in surgery and had never performed a
biopsy. <u>Id</u>. at 1014-15. The expert was excluded under
Alabama law because he was not certified in the same
specialty as the defendant surgeon. The plaintiff's
radiology expert was also disqualified, but for a
different reason. He was a certified radiologist, but
he had not performed mammograms in several years and
was disqualified under federal law from interpreting
mammograms during the time frame of the alleged breach
by the defendant radiologists. <u>Id</u>. at 1015-16.
Although this expert met the requirements in
§ 6-5-548(c), the trial court could still exclude him
because "the legislature did not intend ... to abrogate

the trial court's discretion in matters of admitting expert testimony." Id. at 1020.

Rodgers is not analogous to either excluded expert in Holcomb. First, unlike the surgeon expert, both Rodgers and Karumanchi are board-certified in psychiatry and neurology. Karumanchi does not suggest there is a different certification in hospital psychiatry and Rodgers testified that she could easily step back into a hospital after learning the hospital's routine. March 18 Daubert hearing (doc. no. 260) at 119:8-21. A hospital practice and an outpatient practice are not different specialties under Alabama law.

That leaves Karumanchi to rely on the court's discretion, as the Holcomb court did for the radiologist expert. See Karumanchi's Mot. to Exclude (doc. no. 199) at 21 ("Holcomb is central to this analysis because it establishes that even where a witness may satisfy the technical requirement under

Ala. Code § 6-5-548(c), the trial court retains discretion....”).   But, Karumanchi could not identify any good reason why the court should disregard Rodgers. When asked in the <u>Daubert</u> hearing why there is a material difference between a psychiatrist in a hospital-based practice prescribing Lamictal as opposed to a psychiatrist in an outpatient practice, Karumanchi’s counsel had no response except the bare conclusion that the practices are different.   That is not enough for the court to check its common sense at the door.   Consider, for example, a case where a doctor is charged with malpractice for giving aspirin to a hospital patient who is allergic to it.   The hospital setting would be immaterial to whether that prescription constituted malpractice, and an expert from outside of the hospital who also prescribes aspirin could testify that one should not give aspirin to people who are allergic to it.   Likewise, finding no reason why a hospital setting is different for whether

33

and in what dosage a psychiatrist should prescribe Lamictal, the court holds that Rodgers is similarly situated to Karumanchi in this case.

                              ***

     For the foregoing reasons, it is ORDERED that defendant Dinesh Karumanchi's motion to exclude Dr. Robert Auerbach, Dr. Carla Rodgers, and Dr. Allan Nineberg (doc. no. 199) is denied.

     DONE, this the 11th day of June, 2015.

                         ___/s/ Myron H. Thompson___
                         UNITED STATES DISTRICT JUDGE