IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, SOUTHERN DIVISION


| | | |
|---|---|---|
| COURTNEY McBRIDE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 1:12cv1047-MHT |
| | ) | (WO) |
| HOUSTON COUNTY HEALTH CARE | ) | |
| AUTHORITY d/b/a Southeast | ) | |
| Alabama Medical Center, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |


OPINION

Plaintiff Courtney McBride developed a rare skin disease after receiving treatment at a county hospital followed by her subsequent discharge to a local jail. She brings this lawsuit against the following defendants: Houston County Health Care Authority; Drs. Dinesh Karumanchi and Rajendra Paladugu; the City of Dothan; and Dothan City Jail Correctional Officers

Mamie McCory and Stephanie Johnson.  She asserts that the Health Care Authority and the doctors committed medical malpractice in violation of Alabama law and that the City of Dothan and its correctional officers were deliberately indifferent to her medical needs in violation of the United States Constitution and were negligent in violation of Alabama law.  The court has jurisdiction pursuant to 28 U.S.C. § 1343(a)(3) (civil rights) and § 1367 (supplemental).

The case is now before this court on the defendants' motions for summary judgment.  The motions will be granted in part and denied in part.


## I. LEGAL STANDARD

"A party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any

2

material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must view the admissible evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. Matsushita Elec. Indus. Co. Ltd., v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## II. BACKGROUND

This case arises out of McBride's development of a severe rash that peeled off large parts of her skin. Specifically, she brings medical-malpractice claims against the Houston County Health Care Authority as well as the doctors practicing there, and deliberate-indifference and negligence claims against the City of Dothan and the correctional officers at the Dothan City Jail. As the defendants have moved for summary judgment, the facts are taken in the light most favorable to McBride.

The facts can be divided into three parts: (A) McBride's initial period in the Southeast Alabama Medical Center, which is run by Houston County Health Care Authority; (B) McBride's time in jail; and (C) McBride's subsequent admissions to the medical center at the end of her jail stay and after she was released.

## A. McBride's Initial Period in Southeast Alabama Medical Center

On June 21, 2012, a municipal court revoked McBride's bond on a pending domestic-violence charge and ordered her to jail. After she had a psychological breakdown in the courtroom, she was transported to the behavioral medical unit of Southeast Alabama Medical Center.

While at the medical center, Dr. Karumanchi conducted several psychiatric evaluations of McBride. The day after she arrived, Karumanchi diagnosed her with major depressive disorder, alcohol abuse, and social anxiety. During a subsequent evaluation, on

**4**

June 25, he diagnosed her with bipolar disorder and bulimia, as well as other mental-health issues and alcohol abuse. Along with other drugs for depression, Karumanchi prescribed one 25mg Lamictal[1] tablet twice a day, for a total of 50mg of Lamictal per day, in order to treat the bipolar disorder. He also anticipated that she would eventually move to a higher dosage of Lamictal. Both parties agree that Karumanchi instructed McBride not to stop taking Lamictal suddenly without consulting a doctor because a sudden withdrawal might cause seizures. Karumanchi's medical notes state that he warned McBride about the possibility of a lethal rash and that he instructed the nurse to provide information about Lamictal to McBride. The notes do not mention a warning that Lamictal at higher dosages is more likely to lead to a severe skin disease. The parties dispute whether Karumanchi in fact told McBride

_____

1. Lamictal is the brand name for lamotrigine. Lamictal is used throughout this opinion for consistency.

5

about the possibility of a severe skin rash--specifically Stevens-Johnson Syndrome (SJS), or its more virulent form, Toxic Epidermal Necrolysis (TEN)--that can develop from taking Lamictal at all, as well as whether he was required to tell her about the increased risk of SJS or TEN from higher initial dosages of Lamictal.

As background, SJS occurs when less than 10 % of the skin is affected with blisters.  TEN occurs when more than 30 % is affected.  Between 10 % and 30 %, there is a hybrid diagnosis of SJS/TEN.  At least one expert, Dr. Robert Auerbach, testified that two mucous membranes should also be involved for an SJS or TEN diagnosis.  These membranes can include the mouth, throat, and vaginal area, among other areas.

Although Karumanchi remained the psychiatrist on the case until McBride was discharged to the jail on July 4, several other medical professionals saw McBride during that span.

6

First, after Karumanchi prescribed Lamictal on the afternoon of June 25, Herminia Coppage, a nurse at the hospital, had the responsibility of administering the medication. Coppage knew that that the standard of care was to administer two dosages of Lamictal at 12-hour intervals, but because Karumanchi's order to administer two doses came during the afternoon, Coppage administered both dosages of Lamictal within two and a half hours of each other in the late evening. She stated that she followed the doctor's orders giving the dosages at this interval.[2]

_____

2. McBride contends that Coppage gave up to four doses of Lamictal to McBride that night, relying on billing records, which show four Lamictal pills purchased on June 25. Billing Records (doc. no. 201-10) at 3. However, billing records do not indicate how many of those pills Coppage gave to McBride, and the medical records indicate that Coppage gave only two pills to McBride. Houston County Medical Records (doc. no. 131-1) at 504. Moreover, neither McBride nor her experts stated in their testimony that McBride received four doses. Even taking the evidence in the light most favorable to McBride, the court concludes that Coppage gave only two doses.

The parties dispute whether Coppage also gave McBride a warning about a severe rash as a potential side effect of Lamictal. There is a signed page in the record from June 25 where McBride acknowledged the side effects, including "yellowing of the eyes or skin" for some drug. Houston County Medical Records (doc. no. 131-1) at 644. The signed page, though, does not mention Lamictal, and no other pages are included.

Second, while McBride remained in the hospital, Dr. Paladugu, a psychiatrist, covered for Karumanchi the weekend of June 30 to July 1. He did not change the prescription for Lamictal but did add a prescription for an anti-psychotic drug. McBride testified that she does not remember if Paladugu warned her about side effects of Lamictal but claims that she would have heard a warning about a potentially fatal side effect and its symptoms.

Karumanchi returned after the weekend and was the doctor responsible when the medical center discharged

McBride to the jail on July 4.  Karumanchi maintains
that he told the officer who transported McBride to
jail that if her conditioned worsened, she should
return to the hospital; the officer denies that he was
told any information.[3]


### B. McBride's Time in Jail

McBride arrived in the Dothan City Jail on July 4.
Dothan had several policies at the jail relevant to
this case regarding medical care for prisoners.  First,
because the jail did not have medical personnel on

---

3.  In summary judgment, the evidence is taken in
the light most favorable to the non-moving party.
Here, whether Karumanchi informed the transporting
officer can cut both ways for McBride.  If he did, then
it eliminates a theory of malpractice against
Karumanchi but bolsters McBride's
deliberate-indifference claim against the City of
Dothan and its correctional officers; if he did not,
then, vice-versa.  McBride should not be put at a
disadvantage at summary judgment by having to guess
which defendant is telling the truth.  The court
therefore interprets the evidence in the light most
favorable to McBride against each defendant in summary
judgment and will let the jury at trial decide which of
these defendants is telling the truth.

staff, the city had a policy of transporting prisoners to the hospital should a medical issue arise.  Second, the supervisor would ensure that any message the treating doctor had passed to the transportation officer would be communicated to any other officer that "is going to have any interaction with the detainee." McCory Dep. (doc. no. 172-17) at 43:21-45:23.

When McBride arrived at the jail, the jailing officers put her in a holding cell near the front of the jail, noting her potential suicide risk.  The jail also filled McBride's Lamictal prescription, and she continued to take the drug during her time in jail.

On the next day, McBride began to feel ill.  Her lips became chapped, and she was freezing.  By July 6, two days after she arrived, she reported feeling horrible.  She could not eat and had difficulty getting out of bed.  On the same day, she had a follow-up medical appointment scheduled at a separate medical facility, presumably for mental-health treatment.

During that trip, she did not mention a skin rash or any kind of sickness to either the officer that transported her to the appointment or to the medical personnel.

Over the next four days, McBride's condition continued to deteriorate. Every day, she screamed for people to help her and banged on the door of her cell when she had energy. At some point while in jail, she spoke with Correctional Officer Johnson, a detention lieutenant at the jail, about her condition. At that point, McBride's lips were peeling off. Although Johnson brought her Vaseline and water, she did not take her to the hospital, as per the city's policy of providing medical care. Johnson also brought McBride her medication. Correctional Officer McCory, the other individual defendant, was the jail administrator and worked at least three days when McBride was screaming. She could hear McBride's shouting from her office, but did nothing to help her.

11

Finally, on July 10, when McBride complained of a sore throat and refused to eat breakfast, the jail transported her back to the medical center.

C. McBride's Subsequent Trips to the Medical Center

When McBride arrived at the medical center on July 10, she first had an initial screening. The medical records note that, although she "appear[ed] well" and was "in no distress," she also was "malnourished," had sunken eyes, and her throat pain was a "10/10." CliniCare July 10 Evaluation (doc. no. 172-3) at 4.[4] She had a 101.5 degree fever, difficulty breathing, extremely dry and cracked lips and mouth, and "very dry and ashy skin." Id. She also had dark splotches of skin on her face. Although the nurses wrote in the

_____

4. McBride later stated in the emergency room that the pain was a "9/10." Houston County Medical Records (doc. no. 131-1) at 400. Either way, McBride reported severe pain.

12

medical records that McBride was not taking any medicine, she was still taking Lamictal.

After this initial screening, McBride was sent to the emergency room. She told the nurse that she was taking Lamictal. After an examination, McBride was diagnosed with a sore throat, a fever, mouth ulcers, and a rash.[5] Houston County Medical Records (doc. no. 131-1) at 399. Despite being told McBride was taking Lamictal, the nurse did not put it on McBride's chart. McBride was given medication and later released back to the Dothan City Jail. That night she was released from jail.

After McBride returned home on July 10, she had trouble urinating. Her ears hurt, she had a headache, and she still had splotches on her skin. She went to

---

5. In its section of undisputed material facts, the Health Care Authority stated that, while McBride reported a rash, the physician's assistant did not actually find one. This fact is clearly disputed. The medical records list rash under the "diagnosis" and "discharge instruction" on the discharge form for McBride's July 10 visit to the emergency room. Houston County Medical Records (doc. no. 131-1) at 399.

the emergency room the following day, July 11, and was diagnosed with vaginitis by the doctor. The physician's assistant did not see a rash, and McBride was not diagnosed with any serious medical condition. Although McBride's mother brought in her bag of medications, none of the nurses or doctors asked about Lamictal. The nurses also did not annotate McBride's medical charts to indicate she was taking Lamictal.

The night of July 11 and the following morning, the splotches on McBride's face started appearing on her back and chest. Her eyes became extremely bloodshot, and her body was aching. The next day, when her mother attempted to remove one of McBride's earrings, all of the skin on her ear peeled off. Her mother immediately took her back to the emergency room for the third time in as many days.

Paladugu, who had been the covering physician for one weekend during her previous stay, attended to McBride on that day and realized what was occurring.

14

He ordered her to stop taking Lamictal and told her that she had SJS caused by Lamictal. In the medical record, Paladugu diagnosed her with SJS and stated: "Her symptoms are most likely due to Lamictal. Stevens-Johnson syndrome is one of the side effects of Lamictal." Medical Records (doc. no. 131-1) at 68.

McBride was then transferred to the intensive-care unit at the medical center. For the next four days, rashes covered 99 % of her body, and over 30 % of the top layer of her skin peeled off. Doctors told her that she could die from the condition. On July 16, she was transferred to the University of Alabama-Birmingham hospital, which has additional expertise in the area. Her diagnosis upon transfer was SJS and TEN. She received treatment for nine days and was eventually released.

## III.  DISCUSSION

There are several distinct sets of claims in this case.  The court will first address the state-law claims of medical malpractice against the Health Care Authority and the doctors and then move to the federal constitutional claims and the state-law negligence claims against the City of Dothan and the correctional officers.

## A. Alabama Medical Liability Act

To prevail on her medical-malpractice claim, McBride must prove by substantial evidence that the health care provider "failed to exercise ... reasonable care" and that "such failure probably caused the injury ... in question."  1975 Ala. Code §§ 6-5-548, 6-5-549.  Substantial evidence means that the evidence "would convince an unprejudiced thinking mind of the truth of the fact to which the evidence is directed." 1975 Ala. Code § 6-5-542(5).  The court will first

16

address two overarching issues: several defendants'
objections to expert reports and Karumanchi's,
Paladugu's, and the Houston County Medical Center's
(healthcare defendants) general challenge to McBride's
argument that a 50mg starting dosage of Lamictal can
cause SJS and TEN in general and did so in her case.
It will then address whether a reasonable factfinder
could find that each individual defendant breached the
duty of care, and, if so, that that violation caused
McBride's condition.


## 1. Expert Reports[6]

Defendant Karumanchi contends that Dr. Carla
Rodgers's testimony should be disregarded, and all the

---

6.   The court addressed the methodology and
reliability of the expert opinions in its earlier
Daubert opinion.  McBride v. Houston Cnty. Health Care
Auth., 2015 WL 3648995, at *10 (M.D. Ala. 2015)
(Thompson, J.) (denying defendant Karumanchi's motion
to exclude).   This section concerns whether to
disregard the reports based on procedural issues.

17

healthcare defendants contend that Dr. Allan Nineberg's testimony should be disregarded.  The court disagrees.

Karumanchi first contends that Dr. Rodgers's report should be excluded because her affidavit is not based on personal knowledge.  This argument fails because expert reports do not have to be based on personal knowledge.  See Fed. R. Evid. 602, 703; see also McKinney v. Kenan Transp., LLC, 2015 WL 1100736, at *1 (M.D. Ala. 2015) (Albritton, J.) (stating that expert-witness testimony does not have to be based on personal knowledge); Voter Verified, Inc. v. Premier Election Solutions, Inc., 2010 WL 3123129, at *4 (M.D. Fla. 2010) (Fawsett, J.) (same); Hamilton v. Silven, Schmeits & Vaughan, 2013 WL 2318809, at *4 (D. Or. 2013) (Simon, J.) (same).

To the extent the personal-knowledge requirement in Federal Rule of Civil Procedure 56(c)(4) can be reconciled with Federal Rule of Evidence 602's explicit exemption of expert testimony from the

18

personal-knowledge requirement, it has been interpreted to mean that an "expert must have actually engaged in an examination of the case and its issues but may, unlike a fact witness, rely on posited facts or on inadmissible material (such as scholarly work or empirical data that is technically hearsay), if it is the type of material on which such experts reasonably regularly rely." 11-56 Moore's Federal Practice-Civil § 56.94; see also NAACP-Montgomery Metro Branch v. City of Montgomery, 188 F.R.D. 408, 413 (M.D. Ala. 1999) (DeMent, J.) (finding that expert met personal-knowledge requirement because she set forth the facts underlying her opinion); Pauls v. Green, 816 F. Supp. 2d 961, 978 (D. Idaho 2011) (Winmill, J.) ("Experts may satisfy the personal-knowledge requirement if they provide affidavits containing an opinion formed within their area of expertise and based on their own assessment or analysis of the underlying facts or data.").

Here, Rodgers clearly identified the documents on which she relied in the first part of her report, and there is no indication she did not personally examine these documents. Therefore, even if the personal-knowledge requirement applies, Rodgers's report meets it.

Karumanchi next objects that Dr. Rodgers's declaration is unsworn and constitutes inadmissible hearsay. These arguments are meritless. Rodgers signed and dated her report under penalty of perjury, which substitutes for a sworn affidavit. <u>See</u> 28 U.S.C. § 1746. Additionally, her report can be "reduced to [the] admissible form" of her testimony at trial. <u>Pritchard v. S. Co. Servs.</u>, 92 F.3d 1130, 1135 (11th Cir. 1996) <u>amended on reh'g in part on other grounds</u>, 102 F.3d 1118 (11th Cir. 1996). If Karumanchi is arguing that the report is hearsay because it relies on data or interviews from other studies, that argument is foreclosed by Federal Rule of Evidence 703 and is

likewise meritless.  <u>See</u> Fed. R. Evid. 703 ("If experts
in the particular field would reasonably rely on those
kinds of facts or data in forming an opinion on the
subject, they need not be admissible for the opinion to
be admitted.").

As for Dr. Nineberg, the healthcare defendants move
to disregard as untimely and prejudicial his third
expert report, which was filed as part of McBride's
opposition to summary judgment.  <u>See</u> Nineberg
Declaration (doc. no. 203-14) at 2.  Nineberg has filed
three reports in this case.  The magistrate judge
warned that the first report, filed in May 2014, was
deficient under Rule 26 and mandated that he update the
report.  <u>See</u> <u>McBride v. Houston Cnty. Health Care
Auth.</u>, 2014 WL 4373187, at *10 (M.D. Ala. 2014)
(Moorer, M.J.).  Soon after, in early September,
Nineberg filed an supplemental report.  <u>See</u> Nineberg
Supplemental Report (doc. no. 210-2).  His deposition
followed in late September.  McBride then submitted his

**21**

third report, in December, as an exhibit to her opposition brief.  <u>See</u> Nineberg Third Report (doc. no. 210-3).  This new report contained descriptions of a number of journal articles that show a purported link between increased dosage of Lamictal and SJS and TEN, as well as the additional statement that Nineberg routinely prescribed Lamictal to patients in his practice.

Under Federal Rule of Civil Procedure 26(a)(2)(B), an expert's written report must contain "a complete statement of all opinions the witness will express and the basis and reasons for them," "the facts or data considered by the witness in forming them," and the "witness's qualifications," among other requirements.  The court can impose sanctions for failure to comply with this rule, "unless the failure was substantially justified or harmless."  Fed. R. Civ. P. 37(c)(1).  An untimely report is harmless "when there is no prejudice to the party entitled to receive the disclosure."

_Hewitt v. Liberty Mut. Grp., Inc._, 268 F.R.D. 681, 683 (M.D. Fla. 2010) (Baker, J.).  The party that fails to comply with the requirements bears the burden of proof to show the late disclosure was justified or harmless. _Id_.

Here, regardless of whether the report was untimely, it was harmless.  Nineberg expressed a consistent opinion over his second and third reports that an excessive starting dosage of Lamictal can increase the risk of SJS and TEN, and he referenced the title of every article cited in the third report at his deposition.  He later supplied a copy of these articles to the defendants, save one, over which there seems to be confusion.  At this point, the court declines to disregard any of the articles.  The doctors and the Health Care Authority had the title of each article from the deposition and copies of all but one, and they cross-examined Nineberg about each in the deposition. The articles used in this case should not have come as

23

a surprise.   Regarding the one article not yet supplied to the healthcare defendants, the court gives McBride the benefit of the doubt that there is genuine confusion and that she is not intentionally withholding it from defense counsel.[7]

As to Dr. Nineberg's addition in the third report that he prescribed Lamictal in his practice, it is harmless, even assuming it was untimely.   Nineberg's second report made clear that he is a practicing psychiatrist and included descriptions of Lamictal and its potential side effects as well as his opinions on whether the doctors' prescription of Lamictal breached the standard of care because it could create an increased risk of a serious rash.   This report put the doctors and the Health Care Authority on notice that Nineberg would be speaking to a psychiatrist's

---

7.   Should the article not be turned over to defense counsel or should this become a pattern, the court will welcome additional requests to disregard the evidence.

considerations when prescribing Lamictal.    In other words, the report provided sufficient information for any defendant to ask Nineberg about his familiarity with Lamictal either from his own practice or reading the literature.


2. General and Specific Causation: Lamictal and SJS

Each of the three healthcare defendants argues that there is no scientific proof that Lamictal causes SJS and TEN in general or caused these diseases in this particular case.   McBride, however, has presented enough expert testimony to create a genuine dispute of material fact.

The healthcare defendants first argue that Lamictal is only one of several possible causes of McBride's SJS and TEN rather than the probable cause.   See Lyons v. Vaughan Reg'l Med. Ctr., LLC, 23 So. 3d 23, 28 (Ala. 2009) ("To present a jury question, the plaintiff [in a medical-malpractice action] must adduce some evidence

indicating that the alleged negligence ... <u>probably</u> caused the injury. A mere possibility is insufficient.") (emphasis in original) (internal quotation marks omitted). In particular, they point to the drug Flagyl, an infection or virus, or idiopathic causes as possible alternatives. Although the healthcare defendants' expert echoed this sentiment, McBride's experts gave clear testimony that Lamictal probably caused her SJS and TEN. Indeed, when confronted with other possible causes, both Drs. Nineberg and Auerbach did not hesitate but rather stated that Lamictal was the probable cause. Although they could not completely rule out another cause, just as they could not completely rule out the sun would not rise tomorrow, they did state that Lamictal probably caused McBride's injury. That is all the legal standard requires. The disagreement between the experts establishes a genuine dispute of material fact on this issue.

The healthcare defendants next contend that there is no scientific study showing that a higher initial dosage of Lamictal causes SJS or TEN.  The court's earlier <u>Daubert</u> opinion covers this issue at length, so it will not be covered in full here.  <u>See</u> <u>McBride v. Houston Cnty. Health Care Auth.</u>, 2015 WL 3648995.  The basic two points are that (i) double-blind scientific testing on humans is not required where such testing would be unethical and (ii) McBride's two experts and numerous articles linking her higher initial dosages of Lamictal to SJS and TEN, in lieu of such a study, is enough to raise a genuine dispute of material fact as to whether the higher starting dosage of Lamictal probably caused her SJS and TEN.

In sum, with their argument on causation, the healthcare defendants obfuscate a relatively simple issue.  McBride took a dosage of Lamictal that several experts and several studies say causes SJS and TEN. Although another drug or another environmental factor

might cause SJS or TEN in the absence of this high
starting dosage, it is the most likely explanation
here.  The main question for the jury will be whether
one or more of the healthcare defendants' negligence
caused McBride's disease or whether it was a tragic
situation in spite of the these defendants' best
efforts.  The court now turns to that question.


### 3. Evaluation of Each Healthcare Defendant

Each healthcare defendant argues that he, or it,
did not violate the standard of care, and, even if he,
or it, did, those actions did not probably cause
McBride to develop SJS and TEN.


### a.  Defendant Karumanchi

McBride argues that defendant Karumanchi violated
the standard of care by (i) failing to obtain informed
consent to administer Lamictal at all and to administer
it at a higher than recommended dosage; (ii) failing to

warn McBride about the risks of Lamictal; (iii) prescribing medications at too high a dose and/or too frequently; (iv) failing to give instructions to the jail on how to care for her; (v) failing to obtain a complete history of McBride's previous medical treatment and medications; and (vi) discharging her to the jail even though it was known the jail was inadequately staffed and trained to care for McBride. Karumanchi objects to each theory, arguing that he did not violate the standard of care and that any alleged violation did not cause McBride's medical condition. The court finds that there is a genuine dispute of material fact as to the first four theories (failure to obtain informed consent; failure to warn; administering too high a dosage; and failing to give the jail instruction) but grants summary judgment in favor defendant Karumanchi as to the last two theories. It will first discuss McBride's theories on how Karumanchi

breached the standard of care and then turn to causation.

### i.   Informed Consent[8]

As a threshold, this case raises the question of the difference between informed consent and failure to warn.  The court interprets the informed-consent theory as whether McBride would have taken Lamictal in the first place if she knew the risks and interprets the failure-to-warn theory as whether McBride would have stopped taking Lamictal once she started to see a rash or feel certain side effects had she received an adequate warning.

As to informed consent, Karumanchi first argues that there is no genuine dispute of material fact

---

8.  As McBride points out in supplemental briefing, the Alabama Supreme Court has considered informed-consent claims in the context of prescribing medication.  See Nolen v. Peterson, 544 So. 2d 863 (1989) (holding that involuntary commitment to a mental institution does not ipso facto bar a patient from raising an informed-consent claim about taking potentially harmful antipsychotic medications).

regarding informed consent because the record indicates that he informed McBride of the risks of Lamictal. The court finds that there is a genuine dispute as to whether Karumanchi obtained informed consent to prescribe Lamictal at a starting dosage of 50mg per day; however, it rejects the claim regarding informed consent to give McBride the normal 25mg dosage of Lamictal.

"To prove lack of informed consent, [McBride] will need to establish [i] what disclosure of information is required by the standard of care applicable to a hospital, [ii] establish what she was in fact told, and [iii] prove that had she been given certain inappropriately withheld information she would not have submitted to the medical treatment in question." Houston Cnty. Health Care Auth. v. Williams, 961 So. 2d 795, 814 (Ala. 2006).

The standard of care required Karumanchi to disclose to McBride the same risks as would any "other

reasonably competent physicians practicing in the same general neighborhood and in the same general line of practice." Fain v. Smith, 479 So. 2d 1150, 1152 (Ala. 1985) (internal quotation marks omitted). Karumanchi does not dispute that he should tell patients prescribed Lamictal of the risk of skin rash; indeed, he maintains he did tell McBride. However, he appears to argue that a reasonable doctor would not have informed McBride about the risk of a higher starting dosage because there is no proven link between a higher dosage and development of severe skin rashes. Yet, McBride produced scientific studies that caution doctors about starting at a higher-dosage level based on the increased risk of skin rash. Experts Nineberg and Rodgers also stated in their reports, depositions, and the Daubert hearing that Karumanchi's failure to inform McBride about the risks of a higher dosage breached the standard of care. Based on these sources, there is a genuine dispute of material fact whether a

doctor should disclose to a patient the risk of taking an initial dosage of Lamictal higher than 25mg once per day.

The next element--what Karumanchi told McBride--is disputed. McBride claims that Karumanchi discussed only the potential for weight gain and the need to avoid suddenly quitting Lamictal based on the risk of seizure. Pointing to his medical notes, Karumanchi responds that he told her of the risk of severe skin rash. Even though Karumanchi did make a notation in the medical notes, a reasonable juror could still believe McBride's testimony and find that Karumanchi either lied in the medical record or included rashes in the notation out of habit when prescribing Lamictal but forgot to tell McBride. Moreover, the medical notes do not state whether Karumanchi told McBride about the higher risk of skin rash from the 50mg starting dosage.

Finally, while there is a genuine dispute of material fact over whether McBride would have refused

to take the 50mg dosage had she been informed of the risk of severe skin rash at this higher level, there is no genuine dispute about whether she would have taken Lamictal at all.   Alabama has adopted an objective standard for this test: Would a reasonable patient in McBride's position have consented had she known the material information the doctor failed to provide? <u>Fain</u>, 479 So. 2d at 1153; <u>see also</u> Gregory Cusimano and Michael Roberts, <u>Alabama Tort Law</u> § 17.04.   A patient's testimony may be considered but cannot alone be conclusive of the issue.   <u>Fain</u>, 479 So. 2d at 1154; <u>see also</u> <u>Alabama Tort Law</u> § 17.04 (describing how <u>Fain</u> can be seen as allowing a hybrid test where patient's testimony is material and relevant but not dispositive).

McBride has not presented evidence that a reasonable patient would not take the standard starting dosage of Lamictal even if the patient had a warning about the potential for severe, but rare, side effects.

McBride's experts, Nineberg and Rodgers, routinely prescribe Lamictal, and neither testified to patients refusing treatment at the normal dosage. Indeed, numerous drugs have severe, but rare, side effects, and yet many patients routinely take them. Although McBride stated that she would never have taken the drug at even the normal dosage, that statement, without more, is not enough. On the other hand, a reasonable patient likely would not take a higher starting dosage of a drug if she knew that the higher dosage was linked to a much higher incidence of a potentially deadly skin disease. This is especially true if the higher dosage is not needed, as Drs. Nineberg and Rodgers contend. In sum, there is a genuine dispute of material fact whether Karumanchi violated the standard of care by failing to inform McBride of the dangers of a 50mg starting dosage of Lamictal.

35

### ii.  Failure to Warn

McBride also contends that defendant Karumanchi should be held liable for failing to warn her about the potential severe skin rash from taking Lamictal at a higher dosage.  This theory resembles the informed-consent theory because both boil down to what Karumanchi told McBride before he prescribed the medicine.[9]  Thus, for the reasons described above with regards to the informed-consent theory, there is a genuine dispute of material fact regarding whether Karumanchi warned McBride about the potential risk of

_____

9. However, as discussed above, the two theories pose different questions regarding causation.  Informed consent asks whether McBride would have consented to taking the medication in the first place whereas failure to warn asks whether McBride would have stopped taking the medication had she been warned of the potential severe side effects of a 50mg-starting dosage and been able to connect her symptoms to those effects. These issues will be addressed in the causation section below.

SJS and TEN from an increased starting dosage of
Lamictal.[10]

### iii. Prescribing Medication at Too High a Dosage

As discussed above, there is a genuine dispute of
material fact as to whether defendant Karumanchi's
decision to start Lamictal at 50mg a day breached the
standard of care.  Although Karumanchi contends that he
prescribed the 50mg starting dose because of McBride's
diagnosed bulimia and her past use of Lamictal without
incident, both Drs. Nineberg and Rodgers reject the
decision to increase the initial dosage based on these
conditions.  As such, this is a jury question.

---

10.   Dr. Rodgers also opined that defendant
Karumanchi breached the standard of care by giving an
inadequate warning to a patient known to have bipolar
disorder because he did not ensure she understood the
warning.  Because there is a genuine dispute on whether
he warned her at all, the court need not address this
alternative ground for denying summary judgment.

### iv.   Failure to Give Instructions to the Jail on How to Care for McBride

McBride also argues that defendant Karumanchi breached the standard of care by failing to provide the jail's transporting officer information about her treatment and the warning that she should return to the hospital if her condition deteriorated.  Dr. Rodgers, one of McBride's experts, notes that failure to pass on this information would be a breach of the standard of care.  Rodgers's Report (doc. no. 173-4) at 4.

Karumanchi's only response appears to be that he warned the jail.  Because the transporting officer disputes this fact, McBride has established a genuine dispute of material fact as to whether Karumanchi breached his duty of care by failing to inform the jail of McBride's condition.

**v. Failure to Obtain McBride's Medical History**

Defendant Karumanchi next contends that McBride has not presented any evidence that the failure to obtain past medical history breaches the standard of care.

The court agrees for two reasons. First, despite Karumanchi moving for summary judgment on all grounds, McBride did not address this theory in his opposition briefing and therefore has abandoned the claim. <u>Resolution Trust Corp. v. Dunmar Corp.</u>, 43 F.3d 587, 599 (11th Cir. 1995). Second, in any case, McBride does not point out any expert testimony on how a reasonable doctor in Karumanchi's position would obtain a patient's records. "Expert testimony is generally necessary in a claim under the Alabama Medical Liability Act, as the particular standard of care and its breach must be identified by one with knowledge of the area." <u>Bozeman v. Orum</u>, 199 F. Supp. 2d 1216, 1235 (M.D. Ala. 2002) (Thompson, J.) <u>on reconsideration in part sub nom. Bozeman ex rel. Estate of Haggard v.</u>

_Orum_, 302 F. Supp. 2d 1310 (M.D. Ala. 2004) and _aff'd_, 422 F.3d 1265 (11th Cir. 2005), _abrogated on other grounds by Kingsley v. Hendrickson_, 2015 WL 2473447, --- S. Ct. ----, at *4 (2015).

For these two reasons, summary judgment is granted in favor of defendant Karumanchi on this theory.

### vi. Discharging McBride to Jail Even Though It Was Known to Be Inadequately Staffed

McBride's final theory for defendant Karumanchi's malpractice is that he should not have discharged McBride to the local jail on July 4 when he knew it was inadequately staffed to care for McBride. Summary judgment will be granted in favor of Karumanchi on this theory.

First, McBride again fails to present expert testimony on this issue. _See Bozeman_, 199 F. Supp. 2d at 1235. Neither the expert reports nor the depositions describe whether and to what degree a physician sending a patient to a jail should inquire

40

about the staffing of the jail, much less why Karumanchi did not meet that standard. Second, as described below, McBride has not put forth sufficient evidence to establish that the City of Dothan had an informal custom, in violation of its official policy, of failing to care for inmates at the jail. Thus, even if a physician had a duty to investigate the adequacy of staffing before releasing an inmate to a jail, McBride has failed to show that Karumanchi would have identified a problem. Accordingly, this claim fails.

### vii. Causation

Defendant Karumanchi last argues that even if he breached the standard of care on the remaining theories--prescribing high starting dosages, failing to obtain informed consent, failing to warn, and failing to provide instructions to the jail--none of these acts probably caused McBride to develop SJS or TEN.

These four remaining theories can be thought of as the root cause of the problem (prescribing the higher dosage), and subsequent mistakes that ensured the problem was not prevented. As discussed above, evidence suggests that prescribing the higher dosage probably caused SJS and TEN. The evidence supports the following conclusions: the alleged failure of informed consent about the higher dosage compounded this root cause because there is a genuine dispute as to whether McBride would have taken the Lamictal at the 50mg level to start with had she known the potential consequences; Karumanchi's alleged failure to warn her about the early onset symptoms of SJS and TEN, combined with his warning her not to stop taking the medicine for fear of seizures, likewise compounded the prescribing error by causing McBride to continue taking the Lamictal when she experienced the early onset symptoms in her jail cell and preventing her from identifying the problem to subsequent doctors; and the alleged failure to tell the

jail about McBride's condition ensured the correctional officers did not recognize McBride's symptoms and take her immediately to the doctor.[11]

McBride therefore has presented sufficient evidence to create a genuine dispute regarding whether these breaches probably caused her illness.

### b. Defendant Paladugu

McBride argues that Defendant Paladugu committed malpractice when, as the covering psychiatrist, he

---

11. To the extent Karumanchi, or any defendant, argues that another party's negligence vitiates his negligence, combined and concurring negligence applies in the medical-malpractice context and precludes this argument. <u>Breland ex rel. Breland v. Rich</u>, 69 So. 3d 803, 827 (Ala. 2011). This basic tort theory recognizes that, "[i]f one is guilty of negligence which concurs or combines with the negligence of another and the two combine to produce injury or damage, each negligent person is liable for the resulting injury or damage, and the negligence of each would be deemed the proximate cause of the injury." <u>Marsh v. Green</u>, 782 So. 2d 223, 227 (Ala. 2000) (internal quotation marks omitted). Put differently, an actor earlier in the long chain of events in this case cannot successfully assert there is no causation by pointing to a later actor's negligence.

failed to warn her about the possibility of a severe skin rash from taking Lamictal. Paladugu responds that he did not have a duty to warn and there is no causation because McBride did not hear any of Paladugu's warning. Because McBride does not present sufficient evidence to establish that Paladugu's failure to warn her about the risk probably caused her SJS and TEN, summary judgment will be granted in favor of Paladugu.

The underlying breach for Paladugu, according to McBride, is not that he failed to give a warning, but rather that, once he started giving McBride a warning about Lamictal, he had to give a complete one, including a warning of getting a severe skin rash from a high starting dosage. McBride's causation theory appears to be that she assumed the warning given by Paladugu was the full warning, did not realize that there were other potential side effects such as SJS or TEN, and failed to recognize the symptoms of SJS and

**44**

TEN when she started experiencing them. Put differently, she relied on Paladugu, and he led her astray.

The problem with this theory is that McBride did not hear any warning from Paladugu--that is, she never relied on him to give her the full warning because she never thought he was giving her a warning at all. This makes the situation as if Paladugu gave no warning at all, which all parties agree would not have breached the standard of care. In sum, there is no causation because McBride never relied on Paladugu at all, and her only theory for breach was reliance on an inadequate warning.[12]

---

12. If Paladugu had a general duty to warn, as did Karumanchi, the result here could be different. Simply because a patient does not remember receiving a warning does not mean that she would not have heard an adequate warning about a severe side effect. Indeed, an average patient may not remember the warning about a headache, but would likely hone in on the possibility of a skin rash that can cause skin to slough off and potential death as side effects.

c.    Houston County Health Care Authority

McBride argues that defendant Houston County Health Care Authority committed malpractice based on vicarious liability for the actions of defendants Karumanchi and Paladugu, psychiatric nurse Coppage, who treated McBride in the behavioral medical unit, and the emergency-room nurses who treated McBride starting on July 10.  The Health Care Authority acknowledges that it would be vicariously liable for the actions of these doctors and nurses, but disputes liability on all theories.  Karumanchi and Paladugu are covered above; below, the court addresses the actions of the behavioral-medical-unit and emergency-room nurses.

i. Behavioral-Medical-Unit Nurse

McBride claims that nurse Coppage committed malpractice when treating McBride in the behavioral medical unit by (i) failing to obtain informed consent

**46**

to administer Lamictal at a higher than recommended dose; (ii) failing to warn McBride about the side effects of Lamictal; (iii) failing to document McBride's medication; (iv) failing to administer and monitor medication properly; (v) administering medications at too high a dose; and (vi) administering medications too frequently. The Health Care Authority argues that Coppage did not breach the standard of care on the first three theories and that any breach on the latter three theories did not cause McBride's condition. The court agrees and grants summary judgment for the Health Care Authority as to any liability based on Coppage's actions.

First, the Health Care Authority contends that nurses do not have a duty to obtain informed consent or to warn patients of the side effects of a drug the doctor prescribed. In Wells v. Storey, 792 So. 2d 1034, 1039 (Ala. 1999), the Alabama Supreme Court explicitly "decline[d] to create an independent duty

**47**

that requires hospitals and nurses to ... obtain informed consent from a patient." The court reasoned that, even if a nurse can assist a doctor with a procedure, a nurse "does not necessarily have the requisite knowledge of a particular patient's medical history, diagnosis, or other circumstances which would enable the [nurse] to fully disclose all pertinent information to the patient." Id. at 1038 (internal quotation marks omitted). In other words, Alabama law assumes that doctors have knowledge or training to inform a patient that nurses lack. While one could disagree with the Alabama Supreme Court's logic that nurses do not have a duty to obtain informed consent, it is the law that this court must apply. Nurse Coppage, therefore, do not have a duty to obtain informed consent.

The same logic precludes a failure-to-warn theory. Under this logic, even if a nurse gets a patient to sign a form with warnings about a medication, the

48

doctor would presumably know more details about the different drug options for a patient and the risks associated with each.  Given that the Alabama Supreme Court declined to create overlapping duties for nurses and doctors in the informed-consent context in <u>Wells</u>, it is unlikely that that court would find the same overlapping duties in a failure-to-warn context.[13]

Second, McBride's contention that Coppage failed to document her medications cannot go forward either.  She provides neither expert testimony nor any argument as to how she can proceed on this theory.

As to McBride's last three theories about the failure to administer the medication properly, too frequently, or at too high a dose, McBride has failed to establish that these actions had any causal

_____

13.  McBride also argues that, even if Coppage had no obligation to obtain informed consent, once she decided to inform McBride of any potential side effects, she had an obligation to tell her about the rash as well.  McBride has not cited, nor has the court found, any case law carving out this exception for nurses.

relationship with her illness. Although the Health
Care Authority and McBride agree there is a genuine
dispute of material fact on the <u>breach</u> of the standard
of care by giving McBride her first two doses of 25mg
Lamictal within two and a half hours rather than at
twelve-hour intervals, there is no expert testimony
that this <u>caused</u> McBride to develop SJS or TEN. In the
<u>Daubert</u> hearing, Dr. Auerbach testified that these two
doses were like any other 50mg daily dosages--dangerous
because of the amount taken in one day. Even after
prompting, however, he did not say that the short
interval between the dosages on the first day of
several weeks of taking Lamictal caused or contributed
to McBride's SJS or TEN.

### ii. Emergency-Room Nurses

McBride contends that the emergency-room nurses
breached the standard of care on July 10 and July 11 by
failing to take steps to prevent TEN; failing to review

records from McBride's prior admissions; failing to obtain an accurate and complete medical history; and failing to timely and accurately chart medications that McBride had been administered and prescribed. The Health Care Authority rejects each theory. While there is a genuine dispute of material fact as to whether the nurses breached the standard of care by failing to chart McBride's medications timely and accurately and whether that breach caused McBride's illness, summary judgment will be granted in favor of Houston County Health Care Authority on the rest of these theories.

McBride's first theory--that the nurses failed to take steps to prevent the development of TEN--appears to be more of an umbrella characterization than a separate theory of how the nurses breached the standard of care. Put differently, the other three theories describe how the nurses' breach of the standard of care led to the end result of TEN. The court therefore rejects this umbrella theory.

51

Next, the Health Care Authority argues that failure to review records in an emergency-context does not breach the standard of care.  While the failure to examine records from a month earlier does seem concerning, McBride does not mention this theory in her opposition brief, much less point to expert testimony to establish the standard of care.  McBride has therefore abandoned this theory, and summary judgment will be granted in favor of the Health Care Authority. See Resolution Trust Corp., 43 F.3d at 599.

McBride's third theory is that the nurses breached the standard of care by failing to ask about McBride's medication.  However, as the Health Care Authority contends, there is no factual dispute on this issue. In her deposition, McBride testified that she does not remember if the emergency-room nurses asked her about her medication.  See McBride Dep. (doc. no. 175-5) at 235:1-11; 267:20-268:6.  The intake nurses, on the other hand, testified that they did ask about

medication.  <u>See</u> Hillary Lott Dep. (doc. no. 131-4) at 61:11-61:15; Hunter Clark Dep. (doc. no. 131-6) at 21:16-18.  Given the nurses' definitive answers and McBride's inability to recall, McBride has not established the existence of a factual dispute. Moreover, even if the nurses did not ask about medication, McBride testified that she always told "everybody I'm taking Lamictal."  McBride Dep. (doc. no. 175-5) at 235:9-11.  This moots any argument about the failure to ask about Lamictal because, if the nurses heard from McBride that she was prescribed Lamictal, then the failure to ask about Lamictal could not have caused her development of SJS and TEN.

There, is, however a genuine dispute of material fact about what the nurses did with the information that McBride was taking Lamictal--that is, whether they breached the standard of care by failing to put McBride's medications in the medical charts.  Although McBride does not present her own expert on this issue,

one of the emergency-room nurses for the medical center
testified that, if a patient were to tell a nurse about
her medication, the nurse would breach the standard of
care if she did not include that in the chart. See
Nicole Fennell Dep. (doc. no. 175-4) at 56:17-57:19.
Here, the parties agree that the charts do not include
Lamictal, but there is a genuine dispute of material
fact whether the reason is that McBride never told the
nurses about her medication, as the nurses maintain, or
the nurses failed to chart it, as McBride contends.
Taking the evidence in the light most favorable to
McBride, the court concludes that McBride told the
nurses about Lamictal and their failure to chart this
information constitutes a breach of the standard of
care.

The Health Care Authority argues that it should be
granted summary judgment because, even though one of
its nurses testified that failure to chart medications
would be a breach of the standard of care, this nurse

**54**

never said that any of the emergency-room nurses
actually breached this standard.  It points to
precedent requiring an expert to establish both the
standard of care and its breach.  See Orum, 199 F.
Supp. 2d at 1235.  The court rejects this argument.

Although a plaintiff in a medical-malpractice suit
generally has to use expert testimony to establish
breach and causation, Alabama courts have acknowledged
exceptions where a plaintiff provides other assurances
that her theory of negligence and causation is not
pulled out of thin air.  Such assurances can include
common sense, such as when a foreign object is found in
a patient's body post-surgery, or where an
authoritative textbook on the issue makes an expert
unnecessary.  Id.

While a lay jury would not know intuitively that it
is the standard of care to chart medications, it could
understand evidence of a breach--that is, a chart that
does not list the medication--without an expert. If, as

in this case, both parties agree that a certain action, which is not technically complicated, would violate the standard of care, and all that is left is a factual question whether the nurses took this action, there is no need for a separate expert to opine on the issue. In other words, the jury may need an expert to establish the standard of care for charting medications but does not need an expert to apply it in this case.

The logic behind the exception for medical treatises bolsters this reasoning.  As noted above, Alabama law allows an exception to expert testimony where the plaintiff can identify an authoritative text or treatise that establishes the proper procedure.  Of course, the text or treatise does not comment on the case at issue; instead, courts are willing to allow the text or treatise in lieu of an expert on the standard of care and then let the jury decide if this standard was violated.  When the standard is comprehensible, courts do not require a second expert on breach.  See,

**e.g.**, **Complete Family Care v. Sprinkle**, 638 So. 2d 774, 776 (Ala. 1994) (establishing standard of care, and holding that a doctor violated that standard, based on instructions in a pregnancy kit and the defendant's own admission about what constitutes the standard of care). Similarly, an emergency-room nurse who works for the defendant medical center established the standard of care in this case, and the jury can interpret whether the nurses breached that standard of care without an expert.

Finally, the Health Care Authority contends that the actions of the emergency-room nurses did not cause McBride's condition to deteriorate. However, these nurses breached the standard of care by failing to chart that McBride was taking Lamictal, and that failure could have easily led the doctors to miss the potential diagnosis of SJS or TEN because the doctors could not make the correct connections among her symptoms, Lamictal, and the resulting SJS or TEN.

There is therefore a genuine dispute whether this failure to chart probably caused a delay in diagnosis of McBride's SJS and TEN.


## B. Deliberate-Indifference Claim

Pursuant to 42 U.S.C. § 1983 and the Fourteenth Amendment, McBride asserts that Correctional Officers Johnson and McCory as well as the City of Dothan violated her constitutional rights by being deliberately indifferent to her serious medical needs while in custody. <u>See</u> <u>City of Revere v. Mass. Gen. Hosp.</u>, 463 U.S. 239, 244-45 (1983) (establishing constitutional right to medical care for pretrial detainees). To prevail on this claim, McBride must demonstrate "(1) a serious medical need; (2) the defendant's deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury." <u>Youmans v. Gagnon</u>, 626 F.3d 557, 563 (11th Cir. 2010).

McBride sues Correctional Officers Johnson and McCory in their individual capacities, as well as the City of Dothan for its custom or policy of denying or delaying treatment to inmates with serious medical needs.

### 1. Individual Defendants: Qualified Immunity

Correctional Officers Johnson and McCory raise the defense of qualified immunity to the claim against them. However, for the reasons described below, McBride has established a genuine dispute of material fact regarding their entitlement to qualified immunity.

The doctrine of qualified immunity insulates government agents from individual liability for money damages for actions taken in good faith pursuant to their discretionary authority. Harlow v. Fitzgerald, 457 U.S. 800 (1982); Greason v. Kemp, 891 F.2d 829, 833 (11th Cir. 1990). The test for qualified immunity turns primarily on the objective reasonableness of the

official's conduct in light of established law: "governmental officials ... generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow, 457 U.S. at 818. If the law was clearly established, the immunity defense fails, since "a reasonably competent public official should know the law governing his conduct." Id. On the other hand, if the law was not clearly established at the time of the challenged action, the defendant is entitled to qualified immunity. Id. at 807; Stewart v. Baldwin County Bd. Of Educ., 908 F.2d 1499, 1503 (11th Cir. 1990).

"To invoke qualified immunity, the official first must establish that he was acting within the scope of his discretionary authority" when the alleged violation occurred. Case v. Eslinger, 555 F.3d 1317, 1325 (11th Cir. 2009). This issue is not in dispute here. Once

"the court concludes that the defendant was engaged in a discretionary function, then the burden shifts to the plaintiff to show that the defendant is not entitled to qualified immunity." <u>Holloman ex rel. Holloman v. Harland</u>, 370 F.3d 1252, 1264 (11th Cir. 2004). "[T]he plaintiff must ... show that: (1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation." <u>Id</u>.

### a. Violation of Right

The correctional officers first contend that they were not deliberately indifferent to McBride's serious medical needs while she was in jail.

"In regard to providing pretrial detainees with such basic necessities as food, living space, and medical care the minimum standard allowed by the due process clause is the same as that allowed by the eighth amendment for convicted persons." <u>Wallace v.</u>

<u>Jackson</u>, 667 F. Supp. 2d 1267, 1273 (M.D. Ala. 2009)
(Thompson, J.) (quoting <u>Belcher v. City of Foley, Ala.</u>,
30 F.3d 1390, 1396 (11th Cir. 1994)) (internal
quotation marks omitted).   To prevail on her
denial-of-medical-care claim, McBride must demonstrate
both that she had a "serious medical need" that, if
left unattended, posed "a substantial risk of serious
harm" and that "the response made by [the] officials to
that need was poor enough to constitute an unnecessary
and wanton infliction of pain, and not merely
accidental inadequacy, negligence in diagnosis or
treatment, or even medical malpractice actionable under
state law." <u>Taylor v. Adams</u>, 221 F.3d 1254, 1258 (11th
Cir. 2000) (internal quotation marks and alterations
omitted).

A "serious medical need is considered one that has
been diagnosed by a physician as mandating treatment or
one that is so obvious that even a lay person would
easily recognize the necessity for a doctor's

attention." <u>Farrow v. West</u>, 320 F.3d 1235, 1243 (11th Cir. 2003) (internal quotation marks omitted). "When prison guards ignore without explanation a prisoner's serious medical condition that is known or obvious to them, the trier of fact may infer deliberate indifference." <u>Bozeman</u>, 422 F.3d at 1273 (11th Cir. 2005) (internal quotation marks omitted).

In this case, McBride's psychiatrist, defendant Karumanchi, knew her condition and, taking the evidence in the light most favorable to McBride on this claim, told the jail officer that she should be brought back to the hospital if her condition worsened. "Put another way, the physician found that [McBride's] condition, were it to worsen, would be a serious medical need requiring treatment." <u>Rykard v. City of Dothan</u>, 2011 WL 6813001, at *3 (M.D. Ala. 2011) (Thompson, J.) (finding a serious medical need because the treating physician discharged the plaintiff "with instructions to return if things worsened" and the

63

plaintiff's condition subsequently worsened). Here, McBride's condition worsened. She could not eat, had difficulty getting out of bed, and screamed for help every day in jail. After five days, jail staff finally took her to the hospital. When she arrived, the hospital staff noted that she had a 101.5 degree fever, difficulty breathing, extremely dry and cracked lips and mouth, and ashy skin.

The next question is whether the correctional officers were deliberately indifferent to her serious medical need. McBride "can prove deliberate indifference either by producing evidence demonstrating that necessary medical treatment was delayed for non-medical reasons or by showing that public officials knowingly interfered with a physician's prescribed course of treatment." Id. (internal quotation marks omitted) (quoting Bingham v. Thomas, 654 F.3d 1171, 1176 (11th Cir. 2001)).

Johnson and McCory argue that they were not personally aware of McBride's serious medical need and that, even if they had been, the jail took McBride to doctor's appointments whenever she requested.  As these defendants point out, "imputed or collective knowledge cannot serve as the basis for a claim of deliberate indifference.  Each individual Defendant must be judged separately and on the basis of what that person knows." Burnette v. Taylor, 533 F.3d 1325, 1331 (11th Cir. 2008) (internal citations omitted).  Taking the evidence in the light most favorable to McBride, however, both Johnson and McCory would have heard McBride's screams in the jail.  Johnson saw McBride and gave her Vaseline and water for her lips but did not take her to the hospital even though she requested to go.  McCory heard McBride screaming from her office and therefore was aware that McBride's situation had deteriorated but did nothing.  The court must also assume at this stage that, based on the City of

65

Dothan's policy that the jail supervisor should inform staff about a doctor's instructions, Johnson and McCory knew that the doctor ordered McBride to return to the hospital if her condition worsened.   In other words, Johnson and McCory knew they had to return McBride to the hospital in compliance with the doctor's orders but did not.   The evidence supports the conclusion that this is deliberate indifference to a serious medical need.[14]

This court's previous decision in <u>Rykard</u> bolsters this conclusion.   In <u>Rykard</u>, the plaintiff experienced a hand injury while in the same city jail at issue in this case, and she was eventually transported to the

---

14.   Even without the doctor's instructions, the court would find that McBride put forth substantial evidence that the officers were deliberately indifferent to a serious medical need.   A layperson would certainly recognize that a person who was screaming for help for days, could not eat, had difficulty getting out of bed, had a high fever, and had difficulty breathing warrants medical attention, and the officers failure to seek such medical attention constitutes deliberate indifference.   <u>See Farrow</u>, 320 F.3d at 1246; <u>Bozeman</u>, 422 F.3d at 1273.

medical center for treatment.  2011 WL 6813001, at *1.
The medical center diagnosed her with a contusion and
"discharged her with instructions to return if things
worsened."  <u>Id</u>.  Her hand worsened over the next few
days, and it swelled to the point where the Velcro on
the plaintiff's splint would not fasten and blisters
soon appeared.  <u>Id</u>. at *2.  In response to this
deteriorating condition, the plaintiff called the
guards every 30 minutes, but the guards refused to take
her to the hospital and instead gave her a cream for
her hand.  <u>Id</u>. at *2.  This court held that the jail's
refusal to return Rykard to the hospital, as required
by the doctor's orders, constituted deliberate
indifference.   <u>Id</u>. at *4; <u>see also</u> <u>Young v. City of
Augusta Ga.</u>, 59 F.3d 1160, 1171 (11th Cir. 1995)
(noting that treatment in jail contrary to a doctor's
orders could have made out a claim against individual
jailers, but granting summary judgment on

municipal-liability claim due to lack of custom or policy).

This case bears a striking resemblance to Rykard. Here, as in Rykard, the treating doctor told the jail to return the patient to the hospital if her condition deteriorated. Here, as in Rykard, the patient pleaded with the jail staff to return her to the hospital when the condition in fact deteriorated--in this case, when McBride could not eat and had difficulty getting up, ashy skin, and a high fever. And here, as in Rykard, a member of the jail staff, Johnson, provided a makeshift treatment--water and Vaseline--rather than following the doctor's orders to return the patient to the hospital.[15]

Last, taking the evidence in the light most favorable to McBride, the court concludes that there is a genuine dispute of material fact as to whether Correctional Officers Johnson and McCory's deliberate

---

15.   McCory did not even do that much.

68

indifference to McBride's medical needs caused her injuries. While a delay in medical treatment can constitute deliberate indifference, "an inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed." Lepper v. Nguyen, 368 Fed. App'x 35, 39-40 (11th Cir. 2010). The question, then, is: Did McCory and Johnson's failure to take McBride to the hospital earlier than July 10 make her medical condition worse? According to McBride's expert, Dr. Auerbach, the answer is yes. In the Daubert hearing, he testified that, assuming the hospital was not negligent, it could have recognized McBride's early symptoms of SJS and TEN, made the proper diagnosis, and started adjusting her treatment if the jail had brought her in earlier. April 13 Daubert hearing (doc. no. 263) at 43:14-24.

Therefore, McBride has established a genuine
dispute of material fact as to whether the correctional
officers violated her constitutional rights.  The court
next addresses whether there is clearly established law
that Johnson and McCory's actions violated her
constitutional rights.[16]


    b.  Clearly Established Law

    For the law to be clearly established, "[t]he
contours of the right must be sufficiently clear that a

_____

        16.  McBride also argues that Johnson and McCory
are liable in their individual capacities under a
theory of supervisory liability.  "It is well
established in this circuit that supervisory officials
are not liable under § 1983 for the unconstitutional
acts of their subordinates unless the supervisor
personally participates in the alleged constitutional
violation or there is a causal connection between
actions of the supervising official and the alleged
constitutional deprivation."  Doe v. Sch. Bd. of
Broward Cnty., Fla., 604 F.3d 1248, 1266 (11th Cir.
2010) (internal citations and quotation marks omitted).

        The court has already found that Johnson and McCory
participated in the alleged violation by failing to
respond to what they knew was McBride's serious medical
need.  Accordingly, it need not address the
supervisory-liability theory at this time.

70

reasonable official would understand that what he is doing violated that right." <u>Lowe v. Aldridge</u>, 958 F.2d 1565, 1570 (11th Cir. 1992). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of preexisting law, the unlawfulness must be apparent." <u>Id.</u>; see also <u>Ashcroft v. al-Kidd</u>, 131 S. Ct. 2074, 2083 (2011) ("We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate."). The Eleventh Circuit "recognize[s] three sources of law that would put a government official on notice of statutory or constitutional rights: specific statutory or constitutional provisions; principles of law enunciated in relevant decisions; and factually similar cases already decided by state and federal courts in

the relevant jurisdiction." <u>Goebert v. Lee Cnty.</u>, 510 F.3d 1312, 1330 (11th Cir. 2007).[17]

As a threshold, any reasonable official would understand that a constitutional violation may occur when "officials knowingly interfere with a physician's prescribed course of treatment." <u>Bingham</u>, 654 F.3d at 1176. Indeed, the Eleventh Circuit has noted that its "earlier deliberate indifference decisions have stated that when jailers are aware of serious medical needs they may not ignore them or provide grossly inadequate care" and that "decisions in this area of law are enough to make the right violated clearly established." <u>Danley v. Allen</u>, 540 F.3d 1298, 1313 (11th Cir. 2008), <u>overruled on other grounds by</u> <u>Ashcroft v. Iqbal</u>, 556 U.S. 662 (2009). The Eleventh Circuit has also explicitly held that withholding medical care against a doctor's orders is deliberate indifference. <u>Bauer v.</u>

_____

17. The facts underlying this case occurred in 2012. Therefore the court looks to caselaw before that date.

Kramer, 424 Fed. App'x 917, 919 (11th Cir. 2011) (per curiam) (citing Young v. City of Augusta, Ga., 59 F.3d 1160 (11th Cir. 1995) for the proposition that a jail employee could have been held liable on a deliberate indifference claim had she "ignored the doctor's orders and ... not administered the medication" as instructed); see also Rykard, 2011 WL 6813001, at *3-*4 (same).

As explained above, Johnson and McCory heard McBride screaming and did not return her to the hospital immediately when her condition deteriorated. Such knowing interference with a doctor's prescribed course of treatment--to return her to the hospital--is a constitutional violation under clearly established law. Therefore, there is a genuine dispute of material fact regarding whether Johnson and McCory should receive qualified immunity.[18]

_____

18. It is also clearly established that failing to provide medical care to a prisoner with a serious medical need, even without a doctor's orders, is a (continued...)

## 2.  City of Dothan

The City of Dothan moves for summary judgment, arguing that McBride has not created a genuine dispute of material fact as to whether its provision of medical care to inmates constituted an unconstitutional policy or custom.  The court agrees and grants summary judgment in favor of the city on this deliberate-indifference claim.

To hold a municipality liable under § 1983, a plaintiff must show that the municipality had a policy or custom of unconstitutional activity.  <u>Monell v. Dep't of Soc. Servs. Of City of New York</u>, 436 U.S. 658 (1978).  A single incident is generally not enough to support a policy or custom; instead, there either must be an official policy that is unconstitutional or the

---

violation of that prisoner's right.  <u>See</u> <u>Danley</u>, 540 F.3d at 1313; <u>Bozeman v. Orum</u>, 422 F.3d at 1273.  As such, the officers would likewise not be entitled to qualified immunity even if they did not receive the doctor's orders.

74

relevant practice must be so widespread "as to have the force of law." Craig v. Floyd Cnty., Ga., 643 F.3d 1306, 1310 (11th Cir. 2011).

McBride maintains that the City of Dothan has three customs that are unconstitutional: (i) the city does not provide for adequate funding and staffing of medical personnel in the jail; (ii) the city inadequately trains jailers to recognize and respond to medical needs or prisoners; and (iii) the city routinely fails to take prisoners to the medical center when they need treatment.

The first two theories are easily rejected. As to the first theory, "it is difficult to see what constitutional guarantees are violated" by the policy of taking inmates to a hospital for medical treatment rather than having on-site medical personnel. City of Canton, Ohio v. Harris, 489 U.S. 378, 387 (1989). Thus, the bare argument that the city should have staffed or paid for medical personnel at the jail fails

as a matter of law.[19]   To the extent that McBride contends that the city understaffed or underfunded the jail in general, she provides no evidence for such a contention or explanation of how such understaffing or underfunding caused her injury.   McBride's inadequate-training theory is likewise deficient.   She does not provide any evidence of how the guards are trained to recognize a serious medical need or how such training is constitutionally unacceptable.

McBride's final theory is that, even though the city had an official policy of taking prisoners in the city jail to the hospital for medical needs, it had a custom of failing to do so.   To show a custom, McBride first points to the affidavit of a prisoner, jailed in June and July 2012, that states, "I have observed other detainees of the City of Dothan Jail in clear need of medical attention and who requested medical attention

---

19.   Of course, if a plaintiff could show that the policy led to unacceptably long delays in provision of treatment, such as where a jail is hours from the nearest hospital, that would be another story.

from jailers and administrators. Jail staff and administrators, however, ignored these request [sic] for medical attention. ... This was common practice and custom of the jail." Aff. of Aquanda Critten (doc. no. 172-5). This affidavit fails to provide any details about how many prisoners were not taken to the hospital or the severity of the prisoners' conditions. "To have any probative value, affidavits must be supported by specific facts, not conclusory allegations." Cornelius v. Home Comings Fin. Network, Inc., 293 Fed. App'x 723, 728 (11th Cir. 2008) (citing Evers v. Gen. Motors Corp., 770 F.2d 984, 986 (11th Cir. 1985)). While a prisoner should not be expected to know the names of all other prisoners or their diagnoses, McBride cannot rely on bare assertions, such as those in this affidavit, at summary judgment.

In addition to the affidavit, McBride also cites four legal complaints about the Dothan City Jail over the past eight years. Two of these have nothing to do

with medical care.  Compl. of Terence Pouncey (doc. no. 172-7) at 3-4 (contending that McCory placed him in a cell where he had known enemies, putting him in danger); Compl. of Andrew Keith Berkley (doc. no. 172-8) at 3 (alleging cruel and unusual punishment because he was being jailed for failing to make court-ordered payments).  That leaves two cases with facts from 2006 and 2008, in which the judges held on summary judgment that there was a genuine dispute of material fact regarding whether the city failed to provide adequate medical treatment to prisoners in the local jail.  See Calhoun v. Banks, 2009 WL 1765261, at *9 (M.D. Ala. 2009) (Fuller, J.) (adopting report and recommendation) (finding that 2006 incident where jail failed to treat bleeding head injury of inmate constituted deliberate indifference); Rykard, 2011 WL 6813001, at *3-*4 (finding deliberate indifference in 2008 incident in which a jail failed to treat bad hand injury in violation of doctor's instructions, but

granting summary judgment on municipal-liability claim due to lack of custom or policy).  Even assuming that jail staff were deliberately indifferent to a prisoner's serious medical need in 2006 and 2008, the court cannot conclude that two events that were six and four years before McBride's respectively are enough to establish a policy or custom of deliberate indifference by the City of Dothan.  See Hawk v. Klaetsch, 522 Fed. App'x 733, 735 (11th Cir. 2013) (holding that three incidents over five years was not enough to establish rampant abuse for supervisory liability); see also Ott v. City of Mobile, 169 F. Supp. 2d 1301, 1311 (S.D. Ala. 2001) (Butler, C.J.) (four meritorious excessive-force cases over five years, including only two in the previous four years, were not enough to show custom or policy).

Because McBride has not shown a policy or custom of
deliberate indifference, her § 1983 claim against the
City of Dothan fails.[20]

_____

20.    McBride also argues that the city jail's
policy on filling prescriptions constitutes deliberate
indifference by the city.   The potential violation is
that the city refuses to fill needed prescriptions for
prisoners; however, the jail filled McBride's Lamictal
prescription in this case, so there is no causal
connection between this theory and McBride's injury.
See Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown,
520 U.S. 397, 404 (1997).

Though it does not bear on the analysis in this
case, the court notes that the policy on filling
prescription medication is disturbing.   According to
the jail administrator, Mamie McCory, the policy is to
fill prescriptions only for life-sustaining medication.
McCory Dep. (doc. no. 172-17) at 30:16-21.   That, of
course, begs the question: Who determines what is
life-sustaining?   According to McCory, the jail need
only take one of three actions to make this
determination: (i) looking in the "MVR" (which is not
defined in the deposition); (ii) calling the pharmacy;
or (iii) 'Googling' the medication.   Id. at 59:10-23.

To repeat, it is the policy or custom of the city
that guards at the city jail, with no medical training,
can 'Google' medications to make the determination
whether they are life-sustaining.   Indeed, that is what
McBride contends happened here.   While the jail filled
McBride's prescription, it is easy to imagine a
situation in which a prison guard without the
appropriate expertise decides by a quick internet
(continued...)

80

### C.   Negligence

The City of Dothan, McCory, and Johnson also move to dismiss the negligence claim, arguing that they provided the proper treatment to McBride and that, even if they had, it did not cause her injury.

To the extent that McBride contends that the city's and the correctional officers' failure to give McBride Lamictal at the right time or that their failure to provide her other medications caused her injury, the claim fails.  McBride does not point to any evidence indicating that the city's failure to fill other pills besides Lamictal or its failure to give McBride Lamictal at the right time caused her health to deteriorate.

---

search that an inmate does not need a prescribed medication because it is not "life-sustaining," and the inmate dies or has a serious mental- or physical-health episode as a result.  Such a careless attitude towards the lives of those under the government's control is deeply troubling.

However, the argument that the city and its correctional officers were negligent by failing to take McBride to the hospital survives. This claim mirrors the deliberate-indifference claim discussed above. As discussed above, taking the evidence in the light most favorable to McBride, jail staff, including Johnson and McCory, did not follow the doctor's orders and this delay worsened her injury.

\*\*\*

Summary judgment will be entered in favor of defendant Rajendra Paladugu in all respects. As to the remaining defendants, summary judgment will be entered in their favor only in part as set forth in this opinion. An appropriate judgment will be entered accordingly.

DONE, this the 24th day of June, 2015.

/s/ Myron H. Thompson
UNITED STATES DISTRICT JUDGE